Studstill *vs.* State of Georgia.

No. 2.—JONATHAN· STUDSTILL,· plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] Where defendants indicted jointly, sever on the trial, it is the privilege of the State's counsel to elect which shall be tried first; and where issue is joined upon a plea of *autrefois acquit* by one defendant, before he announces himself ready for trial on the merits, and that issue is disposed of, this does not amount to an election by the State, and the other defendant may still be placed first on his trial.

[2.] The absence of a witness, the object of whose testimony is to impeach another witness, expected to be introduced by the State, is good ground for a continuance; but if the witness on the part of the State is not introduced, this Court will not grant a new trial, notwithstanding the motion for a continuance was refused.

[3.] The original indictment, with the verdict and judgment of conviction thereon, against the principal in the *first* degree, is admissible in evidence, to prove *his* guilt on the trial of the principal in the *second* degree.

Studstill *vs.* State of Georgia.

[4.] The record of the trial and conviction of the principal in the *first* degree, is conclusive evidence of the *conviction*, and *prima facie evidence* of his guilt upon the trial of the principal in the *second* degree, and the burden of proof rests on him to show that the principal in the *first* degree clearly ought not to have been convicted.

[5.] The confessions of the principal in the *first* degree are admissible to prove his guilt on the trial of the principal in the *second* degree, but not to prove the participation of the latter therein.

[6.] It is not competent to prove that the defendant is of weak mind, where it is admitted that he is neither idiot, lunatic nor insane.

[7.] Where the Court charges the Jury correctly on a point of law, it is no error that the Judge did not specify more minutely the shades of difference in the law, where no request is made by counsel for this purpose.

[8.] The presiding Judge has the right, and it is his duty, to declare what the law is upon a given state of facts.

[9.] It is not necessary in the indictment to charge the defendant to be a citizen of the County where the offence is alleged to have been committed.

[10.] The abbreviation, *Thos.* for *Thomas*, in the name of the foreman of the Grand Jury, indorsed on the back of the indictment, and written in full in the body of it, is no variance.

[11.] All technical exceptions to indictments, which would be good at Common Law, are unavailing under the Penal Code, provided the offence is charged in the terms and language of the Code, or so plainly that the nature of the offence charged may be easily understood by the Jury.

Indictment for murder in the second degree, in Lowndes Superior Court. Tried before Judge Scarborough, December Term, 1848.

Jonathan Studstill was put upon his trial, under the following indictment:

Georgia, Lowndes County:

The Grand Jurors, &c. in the name and behalf of the citizens of Georgia, charge and accuse Manuel Studstill and Jonathan Studstill, both of the County and State aforesaid, with the offence of murder, as principals in the second degree. For that one Samuel Mattox, not having the fear of God before his eyes, but being moved and seduced by the instigation of the Devil, on the 7th day of September, 1843, with force and arms in the County aforesaid, in and upon one William Slaughter, in the peace of the State then and there being, feloniously, unlawfully, wilfully, and of his malice aforethought, then and there did make an assault, and that he, the said Samuel Mattox, a certain rifle

gun of the value of twenty dollars, the property of Manuel Studstill, then and there being found, the said rifle gun being then and there charged with gunpowder and a leaden bullet, which rifle gun he, the said Samuel Mattox, in both his hands then and there had and held at, against and upon him, the said William Slaughter, then and there feloniously, unlawfully, and of his malice aforethought, did discharge and shoot off; and that he, the said Samuel Mattox, with the leaden bullet aforesaid, by force of the gunpowder aforesaid, so by him, the said Samuel Mattox as aforesaid, discharged and shot off, him, the said William Slaughter, in and upon the left side of the head of him, the said William Slaughter, then and there feloniously, unlawfully, wilfully, and of his malice aforethought, did strike and wound, giving to the said William Slaughter, then and there, with the leaden bullet aforesaid, out of the said rifle gun, so as aforesaid discharged and shot off, in and upon the said left side of the head of him, the said William Slaughter, one mortal wound of the breadth of one inch and depth of two inches, of which said mortal wound he, the said William Slaughter, on and from the said 7th day September, in the year aforesaid, until the 8th day of September, in the year aforesaid, at the house of one Moses Slaughter, in the County aforesaid, did languish, and languishing did live, on which said 8th day of September, in the year aforesaid, about the hour of nine o'clock in the morning, he, the said William Slaughter, at the house of said Moses Slaughter, in the County aforesaid, of the mortal wound aforesaid, died.

And the Jurors aforesaid, on their oaths aforesaid, do say, that the said Manuel Studstill and the said Jonathan Studstill, on the said 7th day of September, in the year aforesaid, in the County and State aforesaid, then and there feloniously, wilfully, unlawfully, and of their malice aforethought, were present, aiding, helping, abetting, comforting, assisting and maintaining the said Samuel Mattox in the felony and murder aforesaid, in manner and form aforesaid, to do and commit, contrary to the laws of said State," &c.

At the December Term, 1848, the case being called for trial, the defendants severed. The case against Manuel Studstill being called, an issue was joined upon a plea filed of *autrefois acquit*, a Jury impanneled and a verdict rendered in favor of the State. After the verdict, and before Manuel Studstill was tried, the

Studstill *vs.* State of Georgia.

State's attorney moved to put Jonathan Studstill on his trial, to which motion counsel for Jonathan Studstill objected, on the ground that the State had elected to try the other defendant first, by joining issue on the plea, and had no right to place this defendant on his trial until the other issue was entirely disposed of. The Court overruled the objection, and defendant excepted.

The cause having been opened and submitted to a Jury, counsel for, defendant moved the Court to instruct the Jury to find a verdict of " not guilty"—

1st. Because the indictment does not charge Samuel Mattox, the principal in the first degree, as being of the County of Lowndes.

2d. Because in this indictment Samuel Mattox is no where charged directly with the offence of murder.

3d. Because it is no where charged in the indictment that Samuel Mattox and defendant committed the crime jointly.

4th. Because in the indictment the foreman of the Jury is named *Thomas* M. Boston, whereas the name indorsed on the indictment is *Thos.* M. Boston.

The Court overruled the objections, and defendant excepted.

Counsel for the State offered in evidence the original indictment, verdict and judgment against Samuel Mattox, to which defendant objected, on the ground that it was *res inter alios acta*, and certified copies should be produced. The Court admitted the indictment to prove the guilt of the principal in the first degree only. To which decision counsel for defendant excepted.

The defendant then moved a continuance on account of the absence of Samuel Spencer, a practising attorney of that Court, but living in the State of Florida, and who was at that time in Tallahassee, attending as one of the Electors of that State, by which witness he expected to impeach the testimony of one Holliday, who was subpoenaed on the part of the State. Which motion the Court overruled on the ground of a want of diligence in the defendant in procuring the testimony, and the uncertainty of Holliday's being introduced by the State. To which decision defendant excepted.

Holliday was not sworn as a witness on the trial.

The State's counsel offered to prove by John Sanderson, that Mattox said he shot the gun when William Slaughter was killed. Defendant objected. The objection was overruled and the evi-

dence admitted to "fix guilt on Mattox only—the Court stating at the time, that the State must prove by other evidence defendant's participation in the crime." To which decision counsel for defendant excepted.

Defendant's counsel offered to prove that defendant was a man of weak mind—avowing, at the same time, he was neither idiot, lunatic nor insane—for the purpose of lessening the force of his confessions. The Court rejected the evidence and defendant excepted.

The Court charged the Jury, that "criminal negligence was an unlawful act done, or a lawful act done without due caution and circumspection—in other words, a lawful act done carelessly and negligently of human life." To which charge defendant excepted, on the ground that the Court should have gone farther, and charged that the result of the negligent act should be a probable consequence of the act, and that if the result was beyond the range of probabilities, it reduced the crime to voluntary manslaughter, to which there can be neither accessary before the fact, nor principal in the second degree.

The Court charged the Jury, that if Mrs. Bailey had sworn to the truth, the defendant was guilty. To this charge defendant excepted.

Upon the trial, the following testimony was submitted to the Jury upon the part of the State:

*Moses Slaughter*, the father of deceased, sent his son into the woods on horseback; when he next saw him he was in the house, wounded in the head. This was about dark. He died the next morning and was buried. In a few days thereafter he saw him disinterred, and a bullet extracted from the left side of his head by Dr. Briggs—there was no stick in his head. The boy was about fifteen years of age. No bad feeling between deceased and prisoner. There was some bad feeling between witness and prisoner.

*Samuel Slaughter*, the brother of deceased, went to meet him at the ford of the creek on the day he was wounded. Fifteen minutes before he reached the spot he heard a gun fired. Found deceased lying on his hands and knees, wounded in the left side of the head, and Samuel Mattox, Jonathan Studstill and Manuel Studstill with him. Neither of them touched deceased after witness came up. Two or three days after deceased was wounded,

Studstill *vs.* State of Georgia.

Samuel Mattox came to Moses Slaughter's house and told him and witness that he shot the gun in the direction of the creek, where witness found the three with his brother at the time he was wounded. Prisoner said the horse had thrown deceased and jumped on him and kicked him. Prisoner told witness he had better go and get a cart and carry his brother home, which witness did. When the head was washed he saw a hole in his head. Witness afterwards saw the bullet taken out of this hole, which prisoner said was made by a snag on which the horse threw him, when Mattox fired across the creek. There was no ill feeling between Mattox and deceased.

*Dr. Briggs* was called upon to make a *post mortem* examination, after the deceased was disinterred; believed he died from the wound in his head, by a bullet from a rifle gun. The brain was liquid, so that he could not tell to what distance the ball penetrated. Saw no traces of a stick in the wound. There was a stick in the coffin, which went easily into the fracture. The *post mortem* examination took place some time in September, 1843.

*John C. Sanderson* saw the deceased soon after the wound was received, at the creek. When he approached, he saw a stick in the wound and moving with the pulsations of the brain. The boy was then alive. Witness took hold of it and pulled it out. Prisoner picked up the boy's hat, which had a hole in it. When Mrs. Slaughter came up with the cart, witness gave her the stick, and prisoner told her *that* snag or stick had proved her son's death. The bullet was taken from the same hole witness pulled the stick out of. Prisoner told witness the next day, that he was positive that what he had told Mrs. Slaughter about the snag's causing the boy's death was true. Witness asked prisoner to go with him, but he said he had to go to Samuel Mattox's, for Manuel Studstill's gun, which he had left there.

*Rachel Bailey* was the wife of Samuel Mattox at the time the shooting took place, and was present when deceased came riding a horse up to the creek, and then stopped. Jonathan Studstill, Manuel Studstill and Mattox were together when the boy came to the creek. Manuel Studstill gave Mattox the gun, and both the prisoner and Manuel told Mattox to shoot. Both said the old gun wouldn't hit a boy fifteen steps. Witness told them if it would not hit a house fifteen steps, not to shoot. They were all in a laugh. The gun fired and the boy fell. She did not see the

wound that day. Deceased was two hundred yards from Mattox when he shot. No one else was present. They were in a field where she went to milk her cows. The Studstills and Mattox drove up the calves. Witness was in ten or twelve feet when the conversation took place. Does not know whether Mattox took aim or fired at random. After the boy fell, Mattox and the two Studstills went to him. Manuel returned. Witness did not stay more than a quarter of an hour.

### EVIDENCE FOR THE PRISONER.

*Manuel Studstill* was present at the shooting of William Slaughter. The prisoner had nothing to do with it as witness knows of. If prisoner told Mattox to shoot, witness did not hear him. Witness was forty or fifty feet from prisoner and Mattox. Mrs. Mattox (Mrs. Bailey) was about half the distance. Prisoner was some fifteen feet from Mattox when he shot. Witness did not hand Mattox the gun. He did not hear prisoner tell Mattox the gun would not hit a boy fifteen steps. If Mrs. Mattox told Mattox not to shoot, he did not hear her. After the boy fell, witness went with Mattox and prisoner to where the boy was. He afterwards returned and went with Mrs. Mattox to the house. The gun was leaning against a stump or tree. Mattox took it up and shot. Saw a stick in the boy's head when witness and Sanderson went back to where the boy was, and not before. Does not know how it got there. As the gun fired he saw Mattox rise as if from behind a log heap.

There was some attempt to impeach the evidence of Mrs. Bailey, and, also, of Manuel Studstill, but there was nothing in the bill of exceptions showing the extent or effect of it.

In the Supreme Court, error was assigned upon the several exceptions before taken.

C. B. COLE, for plaintiff in error, contended—

1. The evidence makes out a case only of involuntary manslaughter against Samuel Mattox. *Roscoe's Ev.* 630, 653, 659. And in this offence there can be no principals in the *second* degree.

2. The record of the conviction of Mattox was not *conclusive* evidence of his guilt, but the State must show that fact by other evidence. 10 *Pick.* 477.

Studstill *vs.* State of Georgia.

3. The indictment is defective, because it no where charges Samuel Mattox with the offence of murder, and does not charge Mattox and defendants jointly with the murder. 7 *Blackf.* 23. 2 *Hawk.* 224. 2 *Hales*, 187. 1 *Russell*, 548 *and notes, also*, 563.

ROCKWELL and Sol. Gen. HANSELL, for the State.

*By the Court.*—LUMPKIN, J. delivering the opinion.

There are numerous points in this case, and, involving as they do the life or death of a fellow-creature, they are entitled to the most careful and patient examination.

[1.] Manuel Studstill and Jonathan Studstill were jointly indicted as principals, in the *second* degree, in the County of Lowndes, for the murder of one William Slaughter. At the last December Term of the Superior Court, the case against *Manuel* Studstill was called, when counsel for the defendant stated, that there was a preliminary plea of *autrefois acquit* to be first disposed of, before the party was prepared to announce himself ready for trial on the merits. Accordingly, issue was joined, a Jury impanneled, when a verdict was rendered in favor of the State; whereupon, and before any farther proceedings were had against *Manuel* Studstill, the Solicitor General proposed to put *Jonathan* Studstill on *his* trial. To which he objected, on the grounds that the defendants having severed, and the State having elected to proceed first against *Manuel* Studstill, it could not suspend the prosecution against him, but must go through with it. This objection was overruled, and the prisoner was compelled to announce whether or not he was ready for trial; and this is the first error complained of in the bill of exceptions.

It will be perceived, that *Manuel* Studstill cautiously abstained from announcing himself ready for trial on the merits of the indictment, but instead thereof, he pleaded a former acquittal in bar of the prosecution. No step was taken, therefore, in the main trial. All that was done was merely to remove an obstacle out of the way. After this, the case stood as though it had never been called. Concede, however, that the practice was irregular, has the defendant been prejudiced by it ? He could not possibly have been injured, and he may have been benefited by the course pursued. The record shows that *Manuel* Studstill was introduc-

ed as a witness by *Jonathan* Studstill; whereas, had *Manuel* Studstill been first tried and convicted, he would thereby have been rendered incompetent to testify.    1 *Greenlf. Ev.* 417 *to* 424.

[2.] The defendant proposed to continue the case on account of the absence of one Samuel Spencer, by whom he expected to prove that William Holliday, who was subpœnaed as a witness on the part of the State, to testify to a conversation between defendant and Samuel Mattox, in which defendant confessed his guilt, admitted to Spencer, that he, (Holliday,) at the time of the alleged conversation, was beastly drunk, and by reason thereof utterly incapable of understanding any thing.    The Court refused to grant the continuance, and this decision is excepted to.

Had Holliday been offered, during the progress of the trial, in support of the prosecution, we should hold that the Court erred in not allowing the motion—due diligence having been shown to procure the attendance of Spencer.    But the presiding Judge certifies that Holliday was not, in fact, sworn.    Consequently, the necessity for the presence of Spencer was obviated.    Had the State agreed, in the first instance, to dispense with the testimony of Holliday, the application for postponement would have been unavailing.    The failure to introduce him answers the same purpose.    It cures the error.

[3.] The Solicitor General offered in evidence, the original indictment, verdict and judgment against Samuel Mattox, the principal in the first degree, to which the defendant objected on two grounds : 1st. That certified copies *alone* were admissible; and 2dly, Because the record was between different parties, to wit : the State of Georgia and Samuel Mattox.    These objections were overruled, and the prisoner excepted.

The State offered Capt. Sanderson, to prove the acknowledgments of Mattox, the principal in the *first* degree, that he (Mattox) shot the gun when William Slaughter was killed.    This testimony was objected to by the defendant, on the ground that Mattox was not upon his trial, and that he could not be criminated by the confessions of a third person.    The evidence was received by the Court, and the prisoner excepted.

In order to avoid repetition, I have found it convenient to consolidate these two grounds.    They depend on the same principle.

I would remark merely, in relation to one of the points, that original documents, such as bills, answers, declarations, de-

Studstill *vs.* State of Georgia.

crees, verdicts, &c. are always admitted to establish a fact in the same Court where the proceeding was had; especially where they are *in paper*, viz: before enrolment. Copies are at best but secondary proof, and exemplifications of judicial proceedings are admitted only from convenience and the necessity of the case. In some instances the originals are still exacted, as in an indictment for perjury, in a bill or answer; also, on trials for forgery.

As to the main question, that is, how far the record of the conviction of Samuel Mattox, the principal in the *first* degree, and his confessions as to his own guilt are admissible, it is one not without difficulty. It is very desirable, if practicable, to define and apply some definite rule in such cases. It obviously will not do to hold, on the one hand, that as against the accessory and principal in the *second* degree, it is entirely *res inter alios acta*, and no proof whatever of the guilt of the principal; and that the whole question of the principal's guilt is just as open as though there had been no previous trial. Neither, on the other hand, will it do to maintain, that this record is *conclusive* evidence of the principal's guilt. In the case of principal and surety in civil contracts, the doctrine is now well settled, that a verdict and judgment against the former, is only *prima facie* evidence against the latter. It would be strange if, in criminal cases, the accessory or principal in the *second* degree, were not permitted to show that the offence alleged to have been committed did not amount to felony, or not that species of felony with which the principal was charged; as for example, in the case before us, that the homicide was manslaughter and not murder; or, lastly, that the principal himself was manifestly innocent.

[4.] We apprehend this to be the correct doctrine, that the record is *conclusive* evidence of the *conviction* of the principal; that it is *prima facie* evidence of his *guilt*, and that the burthen of proof is thereby cast upon the accessary or principal in the second degree, to establish his innocence by some new and incontestible evidence; as that, in the present case, there was no murder, or that Samuel Mattox was elsewhere, or in a condition, from disease or some other cause, that rendered it impossible for him to have perpetrated the crime.

[5.] And we are of the opinion, that the confessions of Samuel Mattox as to his own guilt, were rightly admitted to inculpate

him, though not to implicate others; and the Court very properly discriminated as to the object for which this proof was allowed.

In South Carolina, in the *State vs. Sims*, (2 *Bailey's Rep.* 20,) the Court held, that the record of the conviction of a slave before a Court of Magistrates and Freeholders, as principal in the felony, might be given in evidence on the trial of an indictment against a free white man as accessory before the fact, and that the confessions of the slave of his own guilt as principal, were admissible in evidence on the trial of a free white man as accessory before the fact.

Whether, under our Statute, which renders slave testimony incompetent against a free white citizen, those propositions be maintainable, we forbear to express any opinion. As between free white persons, however, the authorities all agree, and we think the position incontrovertible, that the record of the conviction of the principal is evidence against the accessory, subject to be rebutted by showing, satisfactorily, that the principal was not guilty; and if the prisoner may, in his defence, resort to parol testimony to establish that, notwithstanding the record, the crime was not, in fact, committed, or that his principal was innocent, it follows, necessarily, that it may be offered on the part of the prosecution to show his guilt; and nothing can be better for this purpose than the free and voluntary confessions of the party.

[6.] John C. Sanderson was offered as a witness in defence of the accused, to prove that the prisoner was a man of weak mind, although it was admitted that he was neither idiot, lunatic nor insane; the object of the proof being to weaken the force of his confessions. The Court rejected the evidence, and this decision is excepted to.

All persons are considered by our Code capable of committing crime, who are neither idiot, lunatic, nor insane, and who have arrived at the age of fourteen years, and before that age, if they know the distinction between good and evil; and if capable of committing crime, they are liable to be convicted upon their own confession. We cannot, therefore, recognize the distinction which is sought to be ingrafted on the law. It would lead to endless metaphysical discussions on the philosophy of the mind. Besides, experience teaches that, in point of fact, the cunning and crafty are much more likely to conceal and misrepresent the truth, than those who are less gifted. It is the trite observation

of all travelers, that if you wish to learn the truth with respect to the health of a country, you must interrogate the children and servants about the matter.

Mrs. Bailey, a witness for the State, swore on the trial, that she had never conversed with one Samuel Spencer on the subject of the murder. The defendant offered John J. Underwood to testify that, at the request of Spencer, he prepared an affidavit for Mrs. Bailey, which she qualified to, without alteration, for the purpose of attacking her credibility. The Court, as we think, very properly rejected this testimony. Fifty persons, who had seen and talked with Mrs. Bailey concerning the transaction, might, any one of them, have communicated to Spencer what she knew or said about it, and thus have enabled him to have her oath drawn up, without any personal interview between deponent and himself.

[7.] The Court charged the Jury that criminal negligence was an unlawful act done, or a lawful act done without due caution and circumspection; in other words, a lawful act done carelessly and negligently of human life. And to the instruction thus given, the defendant excepted, upon the ground that the Court should have gone further, and charged that the result of the negligent act should be a probable consequence of the act; and that, if the result was beyond the range of probability, it reduced the crime to involuntary manslaughter, to which there could be neither accessory before the fact, nor principal in the second degree.

If the charge as given, or as it is contended it should have been given, was applicable to the facts as proven, it might, perhaps, be sufficient to say that it is no just cause of complaint that the instructions are too general, provided they are right. But the evidence shows that Mattox shot at the boy; *negligence*, therefore, has nothing to do with the matter. Nor can we sanction the position assumed by counsel, that, owing to the distance, it was improbable that the ball would reach its object; and that, consequently, the killing is reduced to involuntary manslaughter. Can he who takes deliberate aim at another with a rifle, and kills him, be said not to have intended it? We think not. He might, it is true, suppose the chances to be against it; still he puts forth all his skill to reach the mark, and he succeeds. It is enough, as the act itself was unlawful, if the killing was the possible consequence of the act. To hold otherwise, would be to trifle with human life.

[8.] The Court charged the Jury that if Mrs. Bailey had sworn to the truth, the defendant was guilty; and the prisoner complains of this misdirection. What was the testimony of Rachel Bailey? That she was present when William Slaughter was shot—that he rode to the creek and stopped. The two Studstills and Mattox were together at the time. Jonathan Studstill, the defendant, hallooed at the lad, and bade him go on or come back. Manuel Studstill gave Mattox the gun, and both he and Jonathan told Mattox to shoot. They both said the old gun would not hit a beef fifteen steps. Witness told them if it would not hit a house that distance, not to shoot. They were all in a laugh. The gun fired, and the boy fell. The distance was upwards of two hundred yards.

It will be recollected that this witness was formerly the wife of Mattox, who perpetrated the deed. She would naturally, therefore, represent the transaction in the most favorable light. She does not remember whether the gun was fired with a rest; yet Manuel Studstill swears that it was. She knows nothing of their thrusting the pine-knot into the skull to conceal the bullet, while the unfortunate and unoffending boy was still alive—of the misrepresentation which they made to his miserable parents, as to the cause of his death—of the enmity existing between one of the parties and the elder Slaughter, the father of the boy, &c. But take the affair as narrated by her, and what is there to mitigate the offence from murder to manslaughter? It is not pretended to be voluntary manslaughter. It is insisted that it is at most but involuntary manslaughter. Let us investigate this point.

Involuntary manslaughter consists in the killing a human being, without any intention to do so, but in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence in an unlawful manner. It cannot, surely, be gravely argued, that to send a bullet wilfully into the brain of a peaceable youth, is a *lawful act!* I dismiss then, without comment, this branch of the definition. If it be involuntary manslaughter, at all, it was in the commission of an unlawful act. And the Code expressly declares, that where such involuntary killing shall happen in the commission of an unlawful act, which, in its consequences, naturally tends to destroy the life of a human being, *the offence shall be deemed and adjudged to be murder.* *Prince,* 623.

Studstill *vs.* State of Georgia.

I repeat the question, then, does not the discharge of a rifle, loaded with ball, with deliberate aim at another, even at the distance of two hundred yards and upwards, naturally tend to destroy life ? Let the fatal result of this wanton deed of merciless cruelty furnish the answer. And this is the view of the case which should have been submitted to the Jury. . And we believe with the presiding Judge, that if Mrs. Bailey swore to the truth—and the only doubt is that she may have suppressed a part of it, on account of her peculiar relation to the parties—that Jonathan Studstill was guilty, as a principal in the second degree, of being present, and aiding and abetting the fact to be done.

We have reserved to the last the 4th exception on the record. Before any evidence was submitted, the defendant moved the Court to instruct the Jury to find a verdict of not guilty, on the following grounds :

1st. Because the indictment does not charge Samuel Mattox, the principal in the *first* degree, as being of the County of Lowndes.

2d. Because in the indictment, Samuel Mattox, the principal in the first degree, is no where directly charged with the offence of murder.

3d. Because it is no where charged in the indictment, that Samuel Mattox and the defendant committed the crime jointly.

4th. Because there is a variance between the name of the foreman of the Grand Jury, in the inside and on the back of the bill of indictment.

The 1st, 3d and 4th of these grounds are easily disposed of.

[9.] The Constitution of the State of Georgia requires that all crimes should be prosecuted in the County where they are committed. The residence of the defendant is wholly immaterial as to fixing the venue. It need not be charged that he live in any particular County. It is sufficient if the *offence* is stated to have been committed in the County where it is prosecuted. It is this which gives jurisdiction to the Court. And this is distinctly done in this indictment.

The indictment, after charging Samuel Mattox with the murder, alleges that Jonathan Studstill, at the time and place of the murder, " was feloniously, wilfully, unlawfully, and of his malice aforethought, present, aiding, helping, abetting, comforting, assisting and maintaining the said Samuel Mattox in the

felony and murder aforesaid, in manner and form aforesaid, to do and commit." It is clearly charged that Samuel·Mattox and the defendant committed the offence jointly.

[10.] In the body of the bill of indictment, the foreman's name who found it is written in full, "*Thomas M. Boston*," when on the back, it is indorsed, with the usual abbreviations, "*Thos. M. Boston.*" The variance, we think, is immaterial.

[11.] The 2d specification under the 4th head, namely, that Samuel Mattox is no where charged, directly, in the indictment, with the offence of murder, is deserving of the most mature reflection and consideration.

We believe that this objection would be fatal at Common Law; for it is well settled by ·the standard writers on Criminal Law, that in addition to the description of the offence in the body of the indictment, there must be an express allegation in the conclusion, that the principal feloniously *murdered* the deceased—the word murder being considered a term of art which cannot be supplied by any other. *Long's case*, 5 *Coke*, 245. 1 *Chitty's Crim. L.* 239 *to* 244. 4 *Black. Com.* 306 *to* 309. 3 *Bac. Abr.* 554. *Dyer*, 304. No paraphrases or circumlocution whatsoever, says *Hawkins*, will supply these words of art, which the law has appropriated for the description of the offence; ·as *murdravit* in an indictment for murder; *lepit* in an indictment for larceny; *mayhemiavit* in an indictment for mayhem; *felonice* in an indictment for any felony whatever, &c. 2 *Hawkins' Pl. Cr.* 224.

Indeed this doctrine is not controverted by the State's counsel; but it is argued that while this is the rule in an indictment against the principal in the first degree, it does not obtain in an indictment against an accessory or principal in the second degree. No authority has been read in support of this distinction, and it would seem to us not warranted by principle. The precedents in *Chitty* and other works on Criminal Pleading, do not sustain it. See 3 *Chitty's Crim. L.* 763, *et passim*. The indictment must be quashed, therefore, unless there be some provision in the Penal Code which will save it.

The first section of the 14th division declares, that "every indictment or accusation of the Grand Jury shall be deemed sufficiently technical and correct, which states the offence in the terms and language of the Code, or so plainly that the nature of the

offence charged may be easily understood by the Jury." *Prince*, 658.

This provision was obviously intended to sweep away all technical exceptions to indictments; and such is the character of the one under discussion. It is so denominated in the books. The Supreme Court of Indiana, in *Dias vs. The State*, 7 *Blackf. R.* 20, call it a "*technical allegation.*" And while, under the Common Law, they very properly hold that it is indispensable to the indictment, yet they use this language : " The law is well settled, whether wisely or otherwise we need not stop to inquire, that such description of the offence in the body of the indictment is not sufficient in a charge of murder."

Can we, then, give effect to our own Code, and sustain this objection ? By reference to the definition of murder, it will be found that the offence is stated in the very terms and language of the Code. But were it otherwise, is it not stated so plainly that the nature of the offence charged may be easily understood by the Jury ? After charging the defendant with the offence for which he is prosecuted, as is usual in the beginning of indictments, it proceeds : " For that one Samuel Mattox, on the seventh day of September, in the year eighteen hundred and forty-three, with force and arms, in the County aforesaid, in and upon one William Slaughter, in the peace of the State then and there being, feloniously, unlawfully, wilfully, and of his malice aforethought, then and there did make an assault; and that he, the said Samuel Mattox, a certain rifle gun, of the value of twenty dollars, the property of Manuel Studstill, then and there being found, the said rifle gun then and there being charged with gun powder and a leaden bullet, which rifle gun he, the said Samuel Mattox, in both hands then and there had and held at and against and upon him, the said William Slaughter, then and there feloniously, unlawfully, and of his malice aforethought, did discharge and shoot off; and that he, the said Samuel Mattox, with the leaden bullet aforesaid, by force of the gunpowder aforesaid, out of the rifle gun aforesaid, so by him, the said Samuel Mattox as aforesaid, discharged and shot off, him, the said William Slaughter, in and upon the left side of the head of him, the said William Slaughter, then and there feloniously, unlawfully, wilfully, and of his malice aforethought, did strike and wound, giving to the said William Slaughter, then and there, with the leaden bullet aforesaid, out of the said rifle gun, so

aforesaid discharged and shot off, in and upon the said left side of the head of him, the said William Slaughter, one mortal wound of the breadth of one inch and depth of two inches, of which said mortal wound he, the said William Slaughter, on and from the said 7th day September, in the year aforesaid, until the 8th day of September, in the year aforesaid, at the house of one Moses Slaughter, in the County aforesaid, did languish, and languishing did live, on which said 8th day of September, in the year aforesaid, about the hour of nine o'clock in the morning, he, the said William Slaughter, at the house of the said Moses Slaughter, in the County aforesaid, of the mortal wound aforesaid, died.

" And the Jurors aforesaid, upon their oaths aforesaid, do say, that the said Manuel Studstill and the said Jonathan Studstill, on the said 7th day of September, in the year aforesaid, in the County aforesaid, and State aforesaid, then and there feloniously, wilfully, and unlawfully, and of their malice aforethought, were present, aiding, helping, abetting, comforting, assisting and maintaining the said Samuel Mattox in the felony and murder aforesaid, in manner and form aforesaid, to do and commit," &c.

Can any man of ordinary understanding listen to the reading of this indictment, and not comprehend rightly the nature of the offence charged? Not only would the Jury understand the crime of murder to be charged against Samuel Mattox, but it is apparent that no other offence could be intended; for it is alleged everywhere throughout the indictment, that the killing was done with *malice aforethought.* And it is this ingredient which distinguishes this species of homicide from every other.

But the Code goes further, and prescribes the form of every indictment or accusation. And in this statutory form the identical allegation is omitted—the leaving out of which, it is insisted, is fatal to the indictment. After stating the offence, together with the time and place of committing the same, with sufficient certainty, that is, in the terms and language of the Code, or so plainly that the offence charged may be easily understood by the Jury, the indictment concludes, "contrary to the laws of said State, the good order, peace and dignity thereof." The complaint is that it does not, as at Common Law, contain the repetition, "And the Jurors aforesaid, upon their oaths aforesaid, do say, that the said Samuel Mattox and the said Manuel Studstill and Jonathan Studstill, him, the said William Slaughter, in manner and form afore-

Studstill *vs.* State of Georgia.

said, feloniously, wilfully and of their malice aforethought, did kill and murder," &c.   It is answer enough that the sovereign power of the State has seen fit to dispense with this formality, and to declare that the indictment is sufficiently technical and correct without it.

And we are thoroughly persuaded that these admirable provisions of our Penal Code, like many portions of our Judiciary, have not received that liberal interpretation of which they are susceptible, and which was no doubt intended by their framers. The age is past for the civil and criminal justice of the country to be defeated by the absence or presence of one or more "*absque hoes*," "*then and theres*," "*videlicits*," &c.   And for one, I rejoice to see edifices built, although they may be "with the granite of Littleton, the cement of Coke, the trowel of Blackstone, and the masonic genius of a hundred Chief Justiciaries, and covered with the moss of many generations," swaying beneath the sturdy blows so unsparingly applied by the hand of reform.   Why should the spirit of progress which is abroad in the world, and which is heaving and agitating the public mind in respect to the arts, sciences, politics and religion, halt upon the vestibule of our temples of justice ?   Why not penetrate, fearlessly, the precincts of the Bar and the Bench, and remodel the principles and practice of the old Common Law, to accommodate it to the enlightenment of a rapidly advancing civilization ?   Our Courts should co-operate cordially with the Legislature in building up a *modernized* jurisprudence, upon the broadest foundations.

And which, I would inquire, are Juries most likely to comprehend, the artificial pleadings of the Common Law, or the simplicity allowed by the Code ?   The former is felt by all to be a restriction upon the attainment of justice; and has just the excrescence which the Assembly designed to lop off.

The Judiciary Act of 1799 intended, unquestionably, to abolish all distinction in actions, and to make every writ sufficiently technical, which contained a simple recital of the material facts necessary to a proper understanding of the case by the Jury.   And the defendant's answer was to be of the same character, confessing what was true, denying what was otherwise, and altering anything which required modification.   And upon the declaration and answer thus inartificially drawn, the case was to be submitted.   But this wise and beneficent system, so creditable to our

fathers, was disregarded by the Courts; and the consequence is, that the Legislature is now busily engaged, at each successive session, in retracing our steps, and bringing us back to the point at which we ought to have started half a century ago.  Shall we run the same round on the criminal side of the law ?  I trust not.  Give to these provisions their proper and legitimate construction, and we shall need no Statute to simplify indictments.

Upon the whole matter, the Court is of opinion, and doth decide, that judgment on said indictment ought not to be arrested, which is ordered to be certified to said Superior Court.