## WILSON *vs.* THE STATE OF GEORGIA.

1. Where a defendant was indicted under the name of "Doc." Wilson, a plea of misnomer to the effect that such was not his name nor had ever been, but that his name was and had always been Harrison L. Wilson, was fatally defective in not alleging that the defendant had never been known or called by any other name. An indictment which describes the defendant by the name by which he is generally or commonly known is sufficient.

2. While the better and more general practice is to keep all the minutes together in one book, yet if the clerk keep the minutes of civil proceedings in one book and of criminal proceedings in another, the verity or legal effect of the latter is not thereby destroyed.

(*a.*) Minutes should be signed by the court, but are not invalid for want of a signature unless repudiated by the court.

(*b.*) In the present case the court did not repudiate the criminal minutes, but approved and signed them, and having found against the plea of pendency of a former indictment at the time of the return of that under which the trial was had, we cannot say that he erred.

3. The constitution of 1877 (art. 6, sec. 18, par. 2) requires that the general assembly shall provide by law for the selection of the most experienced, intelligent and upright men to serve as grand jurors,

and intelligent and upright men to serve as traverse jurors. Neither in the constitution nor in the act passed in pursuance thereof is there any discrimination made on account of race, color or previous condition of servitude.

(*a.*) The selection of persons qualified to act as jurors is entrusted exclusively to a board of jury commissioners, under the limitations of the act and the safeguards of an oath to discharge their duty impartially without regard to race, color or previous condition of servitude; and a punishment is provided for violating the law.

(*b.*) Both white and black men were excluded from the lists because, in the opinion of the commissioners, they did not meet the requirements of the law; the commissioners denied being influenced by consideration of color, and on submission to the court, he having found against the plea in abatement, we will not reverse his finding.

4. A challenge to the array of traverse jurors on substantially the same grounds, was properly overruled. Especially so, as it appeared that the names of thirteen negro men were in the traverse jury box, and that the names of others whom witnesses thought qualified to serve did not appear on the tax books from which the jury lists are made up.

5. The challenge to the array of the second panel was substantially the same as to the first, except that there were two colored jurors on it, one of them being number forty-six on the list and the jury having been completed with number forty-three, although the defendant had nine peremptory challenges unused. The challenge was properly overruled.

6. The first twelve jurors of the panel of forty-eight were called, sworn and put on their *voir dire*; the clerk then called two more, who were asked the statutory questions without being sworn. It was almost immediately discovered, and the solicitor general proposed to recall the jurors and swear them; defendant's counsel objected, but assigned no reason therefor; the call then proceeded:

*Held*, that this was not error. The defendant having prevented the jurors from being sworn, and not having shown lapse of time, mixing of the jurors with the crowd or other reason, cannot demand a new trial.

(*a.*) That the defendant had stricken one of the jurors not sworn makes no difference, where defendant both objected to his being recalled and sworn and did not use all of his strikes in securing a jury.

7. Although a section of a charge considered separately might be erroneous, if considered in connection with its context it be correct, it will not necessitate a new trial.

8. The judge stated the issue as follows: "He pleads not guilty; he says he did kill Tinley, but he did it in self-defence, to save his own life, and that is the issue for you to try."

*Held*, that while this was perhaps too decided a manner of stating the issue, it was not error, it being nowhere denied that defendant did the killing, even in his statement, and self-defence being in fact the plea.

9. On a trial for murder, when the killing has been proved to have been done by defendant, it will be presumed to be felonious until the contrary appears, either from the testimony offered by the state or the accused.

10. Exceptions to long paragraphs of a charge, involving several points, without specifying any errors therein, are too general.

(*a.*) The section of the charge complained of in the 12th ground of the motion for new trial was not error.

11. A charge must be taken with its context, and not by isolated sentences culled here and there and put together. So taken, the charge complained of in the 13th ground of the motion was not error.

12. Charges not applicable to the evidence should not be given.

(*a.*) Where a difficulty resulting in a homicide was purely of a personal nature, and had no connection with the house where it occurred, there would have been no relevancy in charging §4332 of the Code. Especially so where the scene of the difficulty was a public bar room in which the defendant was employed, and to which the public were invited.

13. Where it is sought to justify a homicide on the ground of self-defence or defence of habitation or property, §4330 of the Code must be construed together with §4332 and §4333 according to the facts of the case, whether affecting person, property or family.

14. Where the general charge covers the law of a case substantially, if more specific instructions on any given point are desired, written requests should be made.

(*a.*) A saloon where persons are invited to come and drink is a public place, and one who resorts to such a place for that purpose has equal rights there as to that business with the vendor for the time being.

15. The 17th and 18th grounds are covered by the principles already ruled.

16. The 19th ground is disposed of by the 13th head note above.

17. There was no error in the rulings set out in the 20th and 21st grounds of the motion for new trial. The charge was clear, fair and impartial.

18. Where a pure question of fact was submitted to the court, and there was no request by counsel to be heard, it will not require a new trial that the court rendered his decision without hearing argument.

19. Errors should be specified. Taking the entire instructions of the court on the subject of the credibility of witnesses together, they were not erroneous.

20. A prisoner's statement is not under oath, nor is he subject to cross-examination without his consent; the jury may give to the statement such force and weight as they may see proper.

21. While it is the duty of the court to charge on points made in the argument to the jury, growing out of the case and authorized by the testimony, yet his failure to do so will not require a new trial unless at the time of the charge counsel recall the points to his mind.

22. The verdict was supported by the evidence.

October 31, 1882.

Criminal Law. Misnomer. Minutes. Practice in Superior Court. Jurors. Constitutional Law. Practice in Supreme Court. Before Judge SIMMONS. Bibb Superior Court. October Term, 1881.

The following, in connection with the decision, sufficiently reports this case: " Doc." Wilson was indicted for the murder of James Tinley. On the trial, the evidence on behalf of the state was, in brief, as follows: On the afternoon of February 7, 1881, Tinley and Birdsong, a friend of his, went into the bar room of one Loyall in the city of Macon. The entrance to this bar room was through a barber shop, which was in front of it, and from which it was separated by a partition having a double door for entrance to the bar. Wilson was an employé and bar-tender of Loyall. Tinley and Birdsong called for and received drinks. Tinley then called for his account at the bar, and, after going out and obtaining the money, paid it. He said that the account was not correct. Wilson said that it was correct. Loyall, the proprietor, who was present, stated that he did not sell drinks on credit; that if Wilson credited anybody, it was on his

own responsibility, and it was a matter for him.   When Wilson said that the account was correct, Tinley told him that he was a damned liar.   Wilson said that if he were not at his business he would see Tinley outside. The latter replied that Wilson could see him at any time. He and Birdsong then left.   About seven o'clock in the evening, they again returned to the bar.   Loyall went from behind the counter and Wilson took his place.   Tinley and Birdsong called for drinks, which were furnished by Wilson.   They started to drink, when Wilson said to Tinley, " You acted the rascal with me ; " to which Tinley replied, " No, you are the one that acted the rascal with me."   Birdsong said, " Gentlemen, it don't make no difference what passed this evening.   Since Mr. Tinley calls for his drinks and pays for them, you have got no right to say a word."   Wilson replied, " I won't.   I won't say another word."   They then raised their glasses, and while Birdsong was drinking the pistol fired, and when he and the other witnesses looked, they saw Wilson with the pistol in his hand run from behind the counter through the rear of the store and disappear.   Tinley said that he was shot through the heart, and turning, started through the barber shop, fell and died in a few minutes, the shot having taken effect under the left nipple.   No weapon was found about his person, nor any evidence of his being armed.   He had nothing in his pocket save an ordinary pocket knife.   Eugene Wilson, the brother of defendant, was present at the time of the killing.   He subsequently brought to the coroner's jury a knife which he claimed to have picked up at the scene of the tragedy.   When arrested in Columbus, defendant used some prevarication about his name, and in conversation he said that Tinley had something in his hand, which he took to be a knife, but was not certain.

The evidence for the defence was, in brief, as follows : On the afternoon of February 7, 1881, Tinley and Birdsong entered Loyall's saloon and drank together.   Tinley

told Wilson to charge the drinks to him.   Wilson replied
that it was contrary to the instructions of his employer to
charge any more to him ; that he already owed an account
of $3.45.   Tinley stated he would go and get the money
and pay for the drinks.   He left, but shortly returned and
paid the account.   After doing so, he told Loyall that he
did not owe the money.   The latter responded that it
was for him and Wilson to settle; that he himself had
nothing to do with charging the drinks.   Wilson sought
to explain it to him when and where the drinks were
taken by which the account was made.   Tinley said that
if he claimed that the account was true, he was a damned
lying son of a bitch, and continued to curse him.   Wilson
said that if he were from behind the counter, Tinley would
not talk to him in that way, or that he, Wilson, would
whip him.   Tinley said that he would have Wilson's
friends and relations " hunting his burial ground before
to-morrow night;" cursed and abused him a good deal,
and two or three times threatened his life.   He said that
he would kill Wilson in twenty-four hours.   Loyall told
Tinley that it was contrary to the rules of his house to
have such conduct in there, and told Wilson to say noth-
ing more.   He also told Tinley that Wilson went off duty
at eight o'clock, and if he wanted to quarrel, to wait until
Wilson got out of the house.   After the first time that
Tinley and Birdsong were in the saloon, and before the
shooting, Tinley was heard to say to Birdsong, on the
sidewalk, that he was " a good mind to kill him."   Bird-
song proposed to go up the street, saying that they would
return.   Wilson was warned of this threat by one of the
employés in the barber shop, who overheard it.   Near
seven o'clock in the evening, Tinley and Birdsong again
returned to the saloon.   When they came in, Tinley had
a knife in his hand, which he put into his pocket.   They
went up to the counter and ordered the drinks from Wil-
son.   Birdsong told Tinley to kill Wilson ; that he would
stick to him.   Wilson said, " You haven't come to kill me,

Mr. Birdsong? Birdsong said no, he had not, and ran into the barber shop. Tinley said, with an oath, that he had come to kill Wilson, and cut at him over the counter with a knife. Just as he did so, Wilson picked up a pistol and fired upon him. Tinley wheeled, dropped the knife, ran into the barber shop and fell. Eugene Wilson, who had come in to see his brother before Tinley and Birdsong arrived, discovered the knife, picked it up and gave it to the coronor's jury.

The prisoner's statement corresponded substantially with the evidence on his behalf, and gave greater details of what occurred. As to the actual shooting, after stating that Birdsong left the room, he proceeded : " Just as he did that, Mr. Tinley turned his overcoat over, open, and struck his knife over the counter at me that way (illustrating). I dropped back in this position (illustrating), reached my hand over my shoulder, grabbed a revolver that was there and fired. I cocked the revolver just after I grabbed it." Defendant stated that he then ran out of the back door, being still in fear for his life. He went to within five steps of the jail gate, and stayed there nearly five minutes for the purpose of surrendering himself, but, seeing the crowd gathering and being afraid that he would be killed, left the city.

There was other testimony as to character, and conflicting testimony tending to contradict and to corroborate witnesses, which it is not necessary to state here.

The jury found the defendant guilty, and recommended that he be imprisoned for life. He moved for a new trial on numerous grounds, all of which are sufficiently stated in the divisions of the decision where they are discussed, except the following :

(11.) Because the court charged as follows : " In other words, when the state proves the killing, the law presumes it felonious until the contrary appears from circumstances of alleviation, excuse or justification, and it is incumbent on the prisoner to make out such circumstances to the

satisfaction of the jury, unless they arise out of the evidence produced against him by the state." [See 9th division of decision.]

(12.) Because the court charged as follows: "Did the defendant have the deliberate intention to kill James Tinley at the time he fired the pistol? If he did, does the evidence show that he was justified, or in any degree excusable, in the act of killing? If it does show that he had the deliberate intention to kill, and that he was not justified, or in any manner excusable, then you would be authorized to find him guilty. If, upon the other hand, you believe, from the evidence, that he did not have the deliberate intention to kill at the time, or that he was in some way excusable, or that he was justifiable in the shooting, then you would not be authorized to find him guilty of murder. I charge you further, that if you believe, from the evidence, that the deceased, Tinley, went into the bar room kept by the defendant and asked for a drink, and made no effort to hurt or injure the defendant, but while in the act of drinking he was shot and killed by Wilson, then you would be authorized to find him guilty; or if you believe he went into the bar room, and while there angry words were had between the deceased and the prisoner, and the deceased made no effort or attempt to hurt or injure the person of Wilson, and he shot and killed Tinley for no provocation except the words, then you would be authorized to find him guilty. If, upon the contrary, you believe, from the evidence, that Tinley went into the bar room and commenced or renewed a previous quarrel and drew a deadly weapon and made an attempt to commit a violent injury upon the defendant with said weapon, and defendant, without any malice or mixture of deliberation, shot and killed deceased, he would not be guilty of murder. Or if you believe from the evidence that the circumstances were sufficient at the time to excite the fears of a reasonable man, and he acted on these fears and shot and killed Tinley, then you would not be authorized to find him guilty." [See 10th division of decision.]

(13.) Because the court charged as follows: "You will perceive that in order to reduce an offence from murder to manslaughter, it must be done without malice, either express or implied, and without any mixture of deliberation whatever.   *   *   *   If Wilson deliberately shot and killed Tinley with malice, it is murder." This charge was given by the court while charging on voluntary manslaughter.   [See 11th division of decision.]

(14.) Because the court charged as follows: "You will perceive that justifiable homicide is the killing of a human being in self-defence or in defence of his person or property against one who manifestly intends or endeavors by violence or surprise to commit a felony on either; you will also see from the sections I have read that a bare fear of any of these shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable man, and that Wilson acted under the influence of those fears, and not in a spirit of revenge. It must also appear that the danger to Wilson was so urgent and pressing at the time of the killing that, in order to save his own life, the killing was absolutely necessary, and it must appear also that Tinley was the assailant, or that Wilson had really and in good faith endeavored to decline any further struggle before he fired the fatal shot."   [See 13th division of decision.]

(19.) Because the court charged as follows: "As I said before, if you believe from the evidence that the circumstances surrounding him were sufficient to excite the fears of a reasonable man, and Wilson did act under the influence of those fears, and not in a spirit of revenge, then you should acquit him. If, on the other hand, they were not sufficient to excite the fears of a reasonable man, then you would not be authorized to acquit him.   *   *   *   In connection with this, I charge you further, that it must not only appear that the circumstances were sufficient to excite the fears of a reasonable man, and that Wilson really acted under the influence of those fears, and not in a spirit

of revenge; but it must also appear that Wilson thought and believed, and had good reason to think and believe, that the danger was so urgent and pressing at the time of the killing that, in order to save his own life or prevent a felony on his person, the killing of Tinley was absolutely necessary. He must decide the momentous question with reference to his accountability to the law at the time and by the exercise of the same mental and moral faculties which he employs to shoot; and I charge you further, that it should also appear either that Tinley was the assailant or that Wilson had really and in good faith endeavored to decline any further struggle before the fatal shot was fired." [See 13th division of decision.]

(20.) Because the court charged as follows: ." If you find from the evidence that the circumstances were sufficient to excite the fears of a reasonable man, and that Wilson acted under the influence of those fears, and that the danger was so urgent and pressing at the time of the killing that it was absolutely necessary for Wilson to kill Tinley in order to save his own life, or to prevent a felony from being committed on him; and if you find further that Tinley was the assailant, or that Wilson had in good faith endeavored to decline a further struggle before he fired, then you would be authorized to acquit him. If you do not find these facts to be true, then you would not be authorized to acquit him, but should find him guilty of such offence as you believe from the evidence he is guilty of."

(21.) Because the court charged as follows: "If you should have such a doubt as this in your minds, as to whether the defendant is guilty of murder, then give the defendant the benefit of that doubt and acquit him of murder. If you have no such doubt about his guilt, you should convict. If you have the doubt, go next to voluntary manslaughter, and if you have the doubt as above described, give him the benefit of it and acquit him. If you have no such doubt as to voluntary manslaughter,

you should convict. If doubt exists as to voluntary manslaughter, go to involuntary manslaughter, and if the doubt exists acquit him." [See 17th division of decision.]

The motion was overruled, and defendant excepted.

G. T. & C. L. BARTLETT; W. DESSAU; S. HALL; J. S. BOYNTON, for plaintiff in error.

CLIFFORD ANDERSON, attorney general; JNO. L. HARDEMAN, solicitor general, for the state.

CRAWFORD, Justice.

The plaintiff in error was convicted in the court below of the crime of murder; he moved for a new trial, which was refused, and he excepted.

The errors complained of are numerous and important, and will be considered in the order in which they occur in the motion for a new trial.

1. Upon arraignment the defendant filed his plea of misnomer, in which it was alleged that his name was not, nor had it at any time theretofore been, " Doc." Wilson, as charged in the bill of indictment, but was, and had always been, Harrison L. Wilson, and none other.

This plea was stricken on demurrer, and the judgment of the court in striking the plea constitutes the first assignment of error. The insufficiency of the plea consisted in the fact that it did not allege that the defendant had never been known or called by any other name than that of Harrison L. Wilson.

Without entering into any discussion of the question as to whether or not this would have been a good plea under the earlier English rulings, it certainly under our practice was fatally defective. That his *real* name had always been Harrison L. Wilson, and none other, was not at all inconsistent with the fact that he might have always been known and called by the name of " Doc." Wilson.

A person described by the name by which he is generally or commonly known, is good. 65 *Ga.*, 150; 1 Bish. Crim. Proc., 686, and cases cited.

In the case of Jordan *vs.* The State, 60 *Ga.*, 656, where the defendant filed her plea of misnomer, it was distinctly alleged that her name was not Lizzie Jordan, but Eliza Jordan, and that she had never been known or called by any other name. The omission by the defendant in the case before us to make the same allegation, no doubt originated in the fact that he could not verify it, and the wisdom of the rule is thereby illustrated. The plea was properly stricken.

2. The next assignment of error was, because the court, upon the evidence offered, overruled the second plea in abatement. It alleged that at the time the present indictment was found by the grand jury, and at the time of the trial, there was pending in that court an indictment accusing the defendant with the same offence, and for the same transaction, and that before this indictment was submitted and returned by them as true, no order of *nolle prosequi* had been taken and entered on the minutes of the court. The proof upon which the plaintiff in error relied to support this plea was, that the minutes of the court were kept by the clerk in separate books; that is to say, he kept the minutes of the proceedings in all civil causes in one book and of all the criminal causes in another. And furthermore, that these minutes had not been signed up by the judge before the second indictment had been returned into court.

We are not prepared to hold that the judge erred in overruling the defendant's plea upon the proofs submitted.

The law makes it the duty of the clerk to attend all sessions of the superior courts, and to keep fair and regular minutes of their proceedings; but it is not declared that they shall be kept in one book. Whilst we think the better and more general practice is to keep them in

v 69—16

one book, yet that they are kept in two does not destroy their verity or legal effect.

On the second branch of the objection to them, that they had not been signed up by the judge when examined by counsel, it would be sufficient to say that the judge found against the plea on the proof, as he construed it. But we may add that, whilst the law requires the minutes to be signed by the judge, still it is specially provided that if not signed, they are nevertheless valid unless repudiated by the court. Code, §208.

Here, so far from their being repudiated, they were approved and signed by the judge, and upon them appears the order for the *nolle prosequi* of the first bill of indictment. So that the judge committed no error in his ruling on this plea.

3. Because the court overruled and denied the defendant's motion to quash the indictment regularly made in writing upon arraignment, and before plea pleaded, on the ground that the jury commissioners selected no persons of color or African race to serve as grand jurors, but, on the contrary, excluded all colored persons and persons of African race, because of their race and color, from those selected to serve and be drawn as grand jurors for the said county of Bibb. And by reason of such exclusion from the grand juries, though otherwise qualified to serve, the defendant, in the finding of the indictment, had been denied equal protection of the laws and proceedings in the state of Georgia for the security of his person as enjoyed by white persons, and in violation of and contrary to the laws of the United States as contained in section 641 of the revised statutes, and in the fourteenth and fifteenth amendments to the constitution of the United States, and the civil rights acts of congress, and the statutes and constitution of the state of Georgia. Upon this plea issue was joined, and by agreement of counsel submitted to the judge for trial. After an examination of witnesses, which was full, thor-

ough and exhaustive, the judge found against the defendant's plea, and this finding is complained of as illegal.

By the constitution of the state of Georgia, it is declared that "the laws of general operation in this state are, first, as the supreme law, the constitution of the United States, and the laws of the United States, passed in pursuance thereof." Recognizing, then, as we do, the supremacy of the constitution and laws of the United States, passed in pursuance thereof, no violation of the legal or constitutional rights of any person has ever been contemplated or desired by either branch of the state government of Georgia. Hence it will be seen that by article VI, section XVIII, paragraph II, of our state constitution, it is declared that the general assembly shall provide by law for the selection of the most experienced, intelligent and upright men to serve as grand jurors, and intelligent and upright men to serve as traverse jurors." Thus fixing in the organic law the standard of qualification upon the experience, intelligence and uprightness of the men, without reference to race, color or previous condition of servitude. In obedience to this constitutional requirement, the general assembly enacted that a board of commissioners, composed of six discreet persons, should be appointed by the judge of the superior court, who should select from the tax books of each county the names of upright and intelligent persons to serve as jurors, and then to select from these a sufficient number, not exceeding two-fifths, of the most experienced, intelligent and upright men to serve as grand jurors, and that the remainder should constitute the traverse jurors. In the law, therefore, as in the constitution, it will be seen that no distinction resting on race or color is made ; and, not only so, but to insure a proper recognition of the rights of all qualified persons, it is further provided that before the commissioners shall enter upon this duty, they are required to take an oath before the judge of the superior court to impartially discharge their duty in selecting

jurors, without any regard to race, color or previous condition of servitude, in accordance with the constitution of the state. And still further to carry out this constitutional provision, it is made a felony, punishable by penitentiary imprisonment, for any commissioner to violate the law in this regard.

Thus guarded and protected, in the hands of the county commissioners is lodged the power of determining who are the most experienced, intelligent and upright men, and to select them as the proper persons to serve as jurors. They are made the judges of the qualifications and fitness of the men, whose names appear upon the tax books of the county, to be placed on the jury lists thereof, and though others should differ from them, in respect to many who might be chosen or rejected, still the law makes their selections the only legally qualified jurors. *Thomas vs. The State.* 67 *Ga.*, 460.

On the trial of defendant's plea in this case, the testimony submitted to the court shows that white men, as well as black, were excluded from the lists, because, in the opinion of the commissioners, they did not meet the requirements of the law. And beyond this, the evidence of the commissioners themselves was positive and distinct, that the allegations of the plea were untrue, and the judge so found. It being the uniform rule of this court, that where the testimony is sufficient to support a finding by the jury, or the judge, where facts are left to him to decide, that it will not be disturbed, must be held the same in this as in all other cases.

4. The next ground of the motion for a new trial is made upon a challenge to the array, when the first panel of forty-eight traverse jurors were put on the prisoner, for the same reasons substantially as set forth in the plea in abatement touching the selection of the grand jurors, which challenge was overruled by the court, and the same is now assigned as error.

If the finding of the judge on the plea in abatement was right on the evidence, as was held by him, and herein affirmed by this court, then the challenge to the array was properly overruled. And the more especially so, as it had been shown on the trial that there were thirteen negro men in the traverse jury box, whose names were on the tax books, and that many others were, in the opinion of witnesses qualified to serve as jurors, but whose names did not appear on the tax books, and from which the jury lists are made up.

5. The fifth ground is the same as the fourth in all respects, except that in the second panel of forty-eight there were two negro jurors, one of whom stood number 46 on the list, and the last juror taken was number 43, whilst the prisoner stood with nine peremptory challenges in his hands not exhausted, and the state with only three. The judge committed no error in overruling the challenge to the array of the second panel of the traverse jurors.

6. The next assignment of error is, that after twelve of panel number one had been sworn upon *voire dire*, the clerk proceeded to call the two next on the list, 13 and 14, who were asked the statutory questions without having been first sworn.

The record shows that the first twelve jurors composing the full panel of 48 were called up and sworn, and after they had been passed on by the state and the accused, the clerk proceeded to call two other jurors, who were asked the statutory questions before the second twelve had been called and sworn; being discovered, however, almost immediately, the solicitor general proposed to recall the two jurors, swear them and propound the questions; but the counsel for prisoner objected, and upon his objection the judge did not allow the solicitor to recall them.

Thus it appears that the jurors were not recalled and sworn, because of the objection of prisoner's counsel, and, so far as the record discloses, upon no reason whatever. If it had been shown that too much time had elapsed;

that they had passed outside the bar and mingled with the bystanders, or any other reasonable ground of disqualification, then there might have been some ground of objection. But when the failure to swear the jurors after the omission had occurred, was prevented without any legal reason therefor and almost instantly with the omission, we cannot hold that the judge erred in going on with the call.

To say that the juror who disqualified himself might have answered differently had he been under oath is hardly sound. One who would stand up and deliberately make a false answer to escape service on the jury, would have sworn it as quickly. As to the other, though a challenge had been exhausted upon him, prisoner's counsel would not consent to his being recalled and ascertaining whether he might not have disqualified himself, and thereby saved his challenge. This was evidently considered of no moment, as only 11 of the 20 peremptory challenges were exhausted in making up the jury.

7. The next assignment of error will be found in the 9th ground of the motion for a new trial, and consists in the fact that the judge in his charge said to the jury, "If, on the other hand, the evidence satisfies your minds that he is guilty, that he has violated the law, then have the courage so to find, regardless of the consequences to this defendant or any one else." Said charge not directing the jury, that the evidence should satisfy their minds beyond a reasonable doubt, and because they were directed to find the defendant "guilty," if they were satisfied he had violated the law. To disconnect a sentence in the judge's charge from what precedes and follows it, gives no just conception of its meaning, import or legal effect, and this court cannot consider it, except as it stands related to the other instructions given to the jury. Thus considered it is not error.

8. Because the court erred in charging the jury as follows: " He pleads not guilty: he says he did kill Tinley,

but he did it in self-defence, to save his own life, and that is the issue for you to try." Whilst the judge stated in perhaps too decided a manner the issue, yet he did not misstate it; for the killing of the deceased by the defendant was never denied from the beginning to the end of the trial, and the burden of the defence was based upon the ground not that the prisoner did not fire the fatal shot, but that he did it in self-defence, and to save his own life. Indeed, the prisoner in his statement said that when the deceased struck his knife over the counter at him, he " dropped back, reached my (his) hand over my (his) shoulder, grabbed a revolver that was there and fired. I cocked the revolver just after I grabbed it. When I fired, he threw his hands up to his breast," etc. He further said that he went in five steps of the jail gate, and stayed there nearly five minutes to give himself up, as it was his intention to do. This statement, the testimony of Westcott, and the whole line of the defence, did not make it error in the judge to state the issue as he did, that he might instruct the jury on the law applicable to the case.

9. The 11th ground of alleged error is without merit, as held by this court too often to need comment. When the killing has been proved, it is presumed to be felonious until the contrary appears either from the testimony offered by the state or the accused.

10. This ground, as set out in the 12th of the motion for a new trial, is a long extract from the charge, consisting of more than forty lines of manuscript without specifying any special error therein. But upon examination, as found in the general charge, it will be seen that it was based on the Code and the various rulings of this court from the 2d *Ga.* to the unreported cases.

11. As to this the 13th of the motion, it is made up of the first sentence, and the last but one of the judge's charge on the subject of manslaughter, omitting some five intervening ones which explain and make clear the meaning and purport of what he said, and which follows the definition laid down by the Code.

12. The complaint in the 14th is the failure of the judge to read sections 4332 and 4334 in connection with 4330, 4331 and 4333 of the Code. There being no forcible attack, or invasion of the property, or habitation in this case, we do not see the applicability of section 4332 thereto. So far from the ·presence of the deceased being an intrusion upon the premises, it was a public place ; one to which all were invited and desired to come; and was as free if not freer to him who stood in front, than to him who stood behind the counter. The house in which this homicide occurred had no connection whatever with the tragedy. It was personal, and personal only ; therefore section 4332 was properly withheld from the jury. Neither was there anything in the evidence to call for the reading of section 4334 ; the rule of law therein laid down, though wonderfully wise, had no application to this case.

13. Under the 15th ground of defendant's motion, it is pressed with much force and eloquence, that where one under indictment for murder pleads that the killing was justifiable under the law as declared in sections 4330–1, it is error in the judge to put upon him the burden of the proof required by section 4333, as was done in this case.

The charge of a judge can never be separated into segments, and have each part considered and adjudged as though that were all he had said to the jury ; it must be taken in its totality, and squared by the law as a whole.

Looking, therefore, at the part herein complained of, and that also complained of in the 19th ground, as given with the entire charge, it will be seen that the rulings of this court have been followed by the judge below in his instructions to the jury on this branch of the case. 57 *Ga.*, 184 ; 65 *Id.*, 431.

Upon these two grounds we desire to say that there appears no difficulty to our minds in construing the various sections of the Code, declaring what shall be necessary to justify homicide.

Section 4330 provides that one may kill another in self-

defence, or in defence of habitation, property or person, against one who manifestly intends or endeavors by violence or surprise to commit a felony on either.

Section 4331 simply provides that a bare fear shall not be sufficient to justify such killing, and lays down the rule as to what shall be sufficient, etc.

Section 4332 defines what will justify a homicide in defence of habitation, property or person where a felony is attempted by violence or surprise on either, and concludes with this qualification: "But it must appear that such killing was absolutely necessary to prevent the attack and invasion, and that a serious injury was intended, or might accrue to the person, property or family of the person killing."

Section 4333 provides that to make a homicide justifiable upon the ground that it was done in self-defence, it must appear that the danger was so urgent and pressing at the time of the killing that, in order to save his own life, the killing of the other was absolutely necessary.

Thus it is clear that the qualifications in either case to justify a homicide must be made to appear as declared in sections 4332 and 4333, as they bear upon self-defence, or defence of habitation, property or person, defined in section 4330.

14. The 16th assignment rests upon the failure of the judge to charge upon the fact that the defendant was in his own place of business and not bound to retreat therefrom. The facts of the case were covered by the charge, and the law applicable thereto given by the judge. If a more explicit charge was desired, or a different principle wanted, the legal mode of obtaining it was by a written request, and unless that which was given was itself illegal, it will be held sufficient. Besides, as we have said, a saloon where persons are invited to come and drink is a public place, and one who resorts to such a place for such a purpose is at the place for the business contemplated, with equal rights as to the matter in hand with the vendor for the time being.

15. The 17th and 18th exceptions are covered by the principles decided and the rules hereinbefore laid down for arriving at the just meaning and scope of the instructions submitted by the judge to the jury.

16. The 19th was disposed of with the 15th in this opinion.

17. There is nothing inconsistent with the law as repeatedly ruled by this court in the 20th and 21st grounds of the motion for a new trial. Nor do we appreciate the second branch of the 21st ground, which characterizes the charge as being partial to the state and calculated to mislead the jury upon the issue in the case. Upon the contrary, it appears to us a clear, fair and impartial charge upon the law of the case when applied to the facts. If the rules of law bear heavily on a defendant because of his own acts, he should rest his complaint upon the acts and not upon the law. Its penalties have never found favor with its violators.

18. The 22d ground of this motion for a new trial is, that the judge decided against the motion to quash the indictment without hearing argument from counsel on said motion.

It does not appear from the record that there was any intimation given to the judge on the part of defendant's counsel that they desired to submit argument on the evidence or law involved. Had they done so, the judge doubtless would have granted any request that they might have made, expressing a wish to be heard before the decision was pronounced. The principles of law were not in dispute; the testimony had been heard at great length by the judge; he had that all before him; argument could not change facts; and it was a question of fact alone which he was trying; hence we can see no reason why argument was needed, or desired, if indeed it were, but of which the first notice the judge had, so far as disclosed by the record, was this ground in the motion for a new trial.

However all that may be, the real question at last is, was the judgment of the court right? Having held that it was, that ends the question.

19. Complaint is made in the 23rd ground that the judge charged the jury that, in coming to their conclusion as to which witnesses they would give credit, they might take into consideration the manner of the witnesses as they testified, their relationship to the parties, their interest in the case, if they had any, and their bias, if they showed any, when upon the stand. What the error was, is not specified. But it appears that in justice to the judge it would have been fair to have set out the additional instruction he gave them on this point, which was that they should take into consideration the position the witnesses occupied at the time of the killing and their opportunities for knowing what they testified about, and give credit to those whom they thought most entitled to it.

20. The objection set out in the 24th ground appears to be that the judge, in charging upon the prisoner's statement, said to the jury, that it was not under oath, nor was he subject to cross-examination without his consent, and the jury were allowed to give his statement just such force and weight as they saw proper. This being said after the defendant had finished his statement and had announced to the solicitor general that he was willing to be cross-examined, and had been so cross-examined.

As there was no specification of error in this ground, and seeing none ourselves, it must stand as sound law, certainly so far as it went.

21. The 25th and last exception was because the court failed to call the attention of the jury to the legal effect of the testimony as to good character—it having been shown by the witnesses that the defendant was a man of good character—and his counsel having insisted before the jury that the good character of the defendant ought as a matter of law, as well as a matter of fact, to have given weight to the defendant's statement.

Questions of character, when they enter as an element into the defence set up by the accused, become very material, and so, too, when there is an effort to impeach that of a witness. In this case, however, neither the defence nor prosecution turned on the character of the defendant in the least degree. But at most, as stated in the ground we are considering, it was but a failure to charge that which counsel say should have been charged. This same question has been directly before this court, and has been ruled upon and reported certainly in thirteen if not more of its reports, beginning with the 10th and ending with the 60th *Ga.* In the case of *Alston vs. Granberry*, 26th *Ga.*, 380, Judge Lumpkin said: "The error assigned is what the court omitted to say. Counsel have duties to discharge as well as the bench. Happy is that judge who is not guilty of sins of commission."

Again, in *Averett vs. Brady*, 20th *Ga.*, 523, this court held: "While it is the duty of the court to charge the jury on points made in argument to the jury, growing out of the case and authorized by the testimony, yet it is no error if he fails to do so, unless at the time of the charge the counsel recalls the points to his mind. If he does not, he will be considered as having waived them, or acquiesced in the charge as given."

Of like import will be found rulings in 10 *Ga.*, 262; 13 *Id.*, 34; 19 *Id.*, 1; 20 *Id.*, 523; and 26 *Id.*, 380 *supra*; 28 *Id.*, 200; 35 *Id.*, 241; 38 *Id.*, 631; 37 *Id.*, 102; 44 *Id.*, 593; 57 *Id.*, 50; 59 *Id.*, 232; 60 *Id.*, 313.

Taking this whole case and looking at the testimony as it appears in the record, and weighing it in the light of human experience and observation, we cannot see how, under the penal Code of this state, the jury could have returned any other verdict than that of guilty.

With this testimony before him, how any unbiased mind could come to the conclusion that the danger to Wilson was so urgent and pressing at the time of the killing that in order to save his own life the killing of Tinley was absolutely necessary, is utterly beyond our comprehension.

Admit all that Wilson said to be truth itself, he does not make a case of such necessity upon him as that he was obliged to take Tinley's life to save his own at the time he says he seized the revolver, cocked it, and fired.

The knife picked up from the floor was not shown to have been deceased's; the witness who knew him most intimately testified that he never knew him to have such a knife, or to carry weapons of any kind. When examined after his death, he had but his pen-knife in his pocket. As to the other, the circumstances surrounding this tragedy might have satisfied the jury that Eugene Wilson was the owner of that knife; that his presence there in that fatal hour was not accidental; that this strange and unusual weapon fell to the floor, only when it was seen that the revolver in the brother's hands had done its bloody work; it was his eye alone that discovered, and his hand that took it from the floor; human eye, according to the proof, had never seen it in the dead man's hands, and its production, circumstanced as it was, may have convinced the jury that it was there, in the finder's hands, either for use or evidence. However all this may be, the jury on their oaths have said that the plaintiff in error was guilty of murder; a conscientious and upright judge has approved that finding, and as the record shows that the accused has had a fair and impartial trial according to the laws of the state, the judgment below must be affirmed.

Judgment affirmed.