## WATKINS *v.* THE STATE.

82

No. 15050.   FEBRUARY 8, 1945.   REHEARING DENIED MARCH 7, 1945.

86

W. C. Turpin Jr., and S. G. Jones, for plaintiff in error.

T. Grady Head, attorney-general, Charles H. Garrett, solicitor-general, and Maud Saunders, contra.

GRICE, Justice. █ In special ground 1 of his motion for new trial, the movant makes the contention that the court erred in overruling his challenge to the array of jurors. He also excepted pendente lite to the same ruling, and assigned error thereon in his bill of exceptions. The basis of the challenge, the response of the State thereto, and a stipulation as to the facts with respect thereto are fully set forth in the report immediately preceding this opinion. The gist of the challenge was, that the accused, a negro, was being deprived of his rights under the 14th amendment of the constitution of the United States and the civil liberties act, in that no member of his race would be put upon him as a juror, for that negro jurors were systematically and deliberately excluded from the jury list of Bibb County because they were negroes, and for no other reason. We have for determination the problem whether, giving full effect to the decisions of the Supreme Court of the United States on this and related questions, the trial judge abused his discretion in overruling the challenge. The contention made in this ground of the motion for new trial is ruled adversely to

the plaintiff in error for reasons stated in division 6 of this opinion.

■ Grounds 2 and 3 of the motion complain that the court, over the objection of the movant, admitted in evidence certain testimony of Gibson, the deputy sheriff, as to statements made to the witness by the plaintiff in error and by Nathaniel Lamar, who was jointly indicted with the plaintiff in error. This testimony was not subject to the objection that the confessions were not freely and voluntarily made. For an officer to say to a person accused of crime that it is always best to tell the truth, does not render a confession made immediately thereafter inadmissible. *Miller* v. *State,* 94 *Ga.* 1 (21 S. E. 128); *Wilson* v. *State,* 19 *Ga. App.* 759 (92 S. E. 309); *Nix* v. *State,* 149 *Ga.* 304 (100 S. E. 197). Accordingly, it was not error to refuse to charge that a confession so made should be disregarded, as contended in the 7th ground of the motion.

■ It was also objected that the confession made by Nathaniel Lamar, a coconspirator, was made after the conspiracy had ended. The evidence was such as to justify the jury in finding that Lamar was a principal in the first degree, while Watkins was a principal in the second degree. Where two persons are jointly indicted for murder, each may be convicted upon evidence showing that he was either the absolute perpetrator of the crime, or was present, aiding and abetting the other in its commission. *Bradley* v. *State,* 128 *Ga.* 20 (57 S. E. 237). One indicted as principal merely can be convicted on evidence proving him guilty as principal in the second degree, if the facts be such as that the act by which the crime was perpetrated will, on established principles of law, be imputed to him as committed by himself through the agency of another. In such case, the distinction of degree is immaterial. *Collins* v. *State,* 88 *Ga.* 347 (14 S. E. 474). The confessions of the principal in the first degree are admissible to prove his guilt on the trial of the principal in the second degree. *Studstill* v. *State,* 7 *Ga.* 2 (5). But, say his counsel, the confession of Lamar should not have been admitted to show the latter's guilt, because Watkins, in open court, admitted Lamar's guilt. Evidence that is relevant can not be kept from the jury by a waiver of proof on that point, or an admission of the fact. *Clayton* v. *Brown,* 30 *Ga.* 490.

■ Grounds 4 and 5 of the motion assert that a wrong was done to the prisoner by the trial judge, who, having been requested to instruct him as to his rights in making a statement, spoke to him

in the presence of the jury as follows: "You are being charged with the offense of murder. You are not under oath and you can make your statement to the court or any member of the jury what you want the jury to know about this case. It is incumbent upon you to tell them. Speak out loud now so that they can hear what you have to say, and make any statement regarding this case that you desire." The record before us further shows that, after the State rested its case, counsel for the accused addressed the court as follows: "Your honor, the defendant desires to make a statement to the jury in this case. Would the court instruct him as to his rights?" Whereupon, his honor responded with the words, "All right," immediately preceding the extract complained of. The gist of the complaint here is that the court used the word "incumbent," whereas the defendant was not required to make any statement at all, and that the court should have so instructed him. His counsel, speaking for him, having stated to the court that the prisoner desired to make a statement, he was not harmed by the use of the inapt expression employed by the judge. His counsel evidently had in mind the Code, § 38-415, which permits a defendant to make, not under oath, a statement to the jury. In view of the above recitals, it would be straining to conclude that it was understood otherwise than as informing him, as Agrippa said to Paul when brought before the king in order that charges made against him might be examined, "Thou art permitted to speak for thyself." Acts 26, 1. There is no merit in these grounds.

■ Ground 6 complains that the court overruled the movant's motion to declare a mistrial because the solicitor-general over objection was reading to the jury the alleged confession of Nathaniel Lamar, the alleged principal in the first degree, it containing an inflammatory statement against a certain innocent person. The court overruled the motion for mistrial, stating that, "This is only evidence which has been offered to show you the confession on which the alleged principal in the first degree was convicted, and it has no bearing on this case, with the exception that it shows the claimed confession of the alleged principal in the first degree. This man on trial can not be convicted as principal in the second degree unless that fact is satisfactorily shown by other evidence." There is nothing in this ground to warrant the granting of a mistrial.

■ In *Padelford* v. *Savannah*, 14 *Ga.* 438, may be found the

statement that "The Supreme Court of Georgia is co-equal and co-ordinate with the Supreme Court of the U. S.; and therefore the latter can not give the former an order, or make for it a precedent." Judge Benning's reasoning in that case is buttressed by many expressions from outstanding statesmen and jurists who flourished in the dawn of the republic, and is based on a concept that was common to leading men of all sections in the earlier days; yet, as time rolled on, the very stars in their courses seemed arrayed against the plan of the founding fathers. One is sometimes led to wonder if the States, once sovereign, have not become, from a practical standpoint, under the expanding powers of the Federal government, the exercise of which has been sanctioned by the Supreme Court of the United States under its interpretation of the powers delegated by the States, little more than geographical subdivisions of a consolidated government, with but a minimum of authority to regulate their own internal affairs, and shorn of power to deal with their own domestic problems in their own way.

Views similar to those uttered by the Georgia judge in *Padelford* v. *Savannah,* supra, were expressed by Chief Justice McKean of Pennsylvania in Respublica *v.* Cobbet, 3 Dallis, 467, and by the great Judge Spencer Roane of the Supreme Court of Appeals of Virginia in Hunter *v.* Martin, 4 Munford (18 Va.) 1. Nor were such opinions foreign to the courts of Massachusetts, Ohio, Wisconsin, California, Missouri, and Illinois. Wetherbee *v.* Johnson, 14 Mass. 417; Johnson *v.* Gordon, 4 Cal. 368; In re Booth, 3 Wis. 1, 49; Knoup *v.* Piqua Branch of State Bank, 1 Ohio St. 603; Chadwick *v.* Moore, 8 Watts & Serg. (Pa.) 49 (42 Am. D. 267). To recall how prevalent such statements were at one time in various sections of the country, as found in court decisions, resolutions of State legislators, and the deliverances of representatives and senators on the floor of the American Congress, one has but to acquaint himself with Warren's The Supreme Court in United States History. But such language as was contained in the Georgia case referred to above to-day sounds like a voice from the tomb. Indeed, one who went to battle for four years, seeking to maintain the principle on which that pronouncement rests, observed with reference to that opinion as follows: "The war killed that decision as it did the one in the Dred Scott case, and both are buried in the same grave." Report of Georgia Bar Association

(1909), pp. 132, 134. The writer referred, of course, to the controlling pronouncement in that decision, which was that the Supreme Court of Georgia had the right to decide for itself whether or not a municipal ordinance, or an act of the General Assembly, was a violation of the constitution of the United States, regardless of the interpretation placed thereon by the Federal Supreme Court. A similar thought to that contained in the words quoted was in the mind of Chief Justice Bleckley when, speaking for this court in *Wrought Iron Range Co.* v. *Johnson,* 84 *Ga.* 754 (11 S. E. 233, 8 L. R. A. 273), he said: "After the State has yielded to the Federal army, it can very well afford to yield to the Federal judiciary. . . The doctrine of coequality and co-ordination between the Supreme Court of Georgia and the Supreme Court of the United States, so vigorously announced by Benning, J., in *Padelford* v. *Savannah,* 14 *Ga.* 439, regarded now from a practical standpoint, seems visionary. Its application to this, or any like case, would be a jarring discord in the harmony of law. Moreover, any attempt to apply it effectively would be no less vain than discordant. When we know with certainty that a question arising under the constitution of the United States has been definitely decided by the Supreme Court of that government, it is our duty to accept the decision, for the time being, as correct, whether it coincides with our own opinion or not. Any failure of due subordination on our part would be a breach, rather than the administration, of law." It needs scarcely to be added that this court, when a question arises as to the construction of a portion of the constitution of the United States, or a statute enacted in pursuance thereof, feels it to be its duty to follow, as binding precedents, the adjudications of the Supreme Court of the United States. *State* v. *Atlantic & Gulf Railroad Co.,* 60 *Ga.* 268; *Georgia Railroad* v. *Cubbedge,* 75 *Ga.* 321; *Murray* v. *Miller,* 157 *Ga.* 11 (121 S. E. 113); *Slicer* v. *State,* 168 *Ga.* 566 (148 S. E. 385).

Counsel for the accused rely on that line of decisions by the Supreme Court of the United States which hold in effect that, the absence of all negroes from the petit jury by which a negro is tried for an offense, resulting from a systematic and arbitrary exclusion of negroes from the jury lists solely because of their race or color, is a denial of the equal protection of the laws guaranteed to him by the 14th amendment of the United States constitution. Neal

*v.* Delaware, 103 U. S. 370 (26 L. ed. 567); Norris *v.* Alabama, 294 U. S. 587 (55 Sup. Ct. 579, 79 L. ed. 1074); Strouder *v.* West Virginia, 100 U. S. 303 (25 L. ed. 664); Ex parte Virginia, 100 U. S. 339 (25 L. ed. 676); Gibson *v.* Mississippi, 162 U. S. 565 (16 Sup. Ct. 904, 40 L. ed. 1075); Rogers *v.* Alabama, 192 U. S. 226 (24 Sup. Ct. 257, 48 L. ed. 417); Martin *v.* Texas, 200 U. S. 316 (26 Sup. Ct. 338, 50 L. ed. 497); Hollins *v.* Oklahoma, 295 U. S. 394 (55 Sup. Ct. 784, 79 L. ed. 1500); Hale *v.* Kentucky, 303 U. S. 613 (58 Sup. Ct. 753, 82 L. ed. 1050); Pierre *v.* Louisiana, 306 U. S. 354 (59 Sup. Ct. 536, 83 L. ed. 757); Hill *v.* Texas, 316 U. S. 400 (62 Sup. Ct. 1159, 86 L. ed. 1559); Hill *v.* Texas, 316 U. S. 655 (62 Sup. Ct. 1048, 86 L. ed. 1735); Bush *v.* Kentucky, 107 U. S. 110 (1 Sup. Ct. 625, 27 L. ed. 354); Smith *v.* Texas, 311 U. S. 128 (61 Sup. Ct. 164, 85 L. ed. 84). Perhaps the strongest case, from the viewpoint of the plaintiff in error, and the one on which reliance is chiefly placed, is Norris *v.* Alabama, supra, the contention being that the facts of that case, and the ruling of the Supreme Court of the United States therein, compel a reversal of the instant case.

The Federal Supreme Court has several times said that it is not necessary that negroes actually serve on the jury that tries an accused negro, there being no requirement that there shall be a mixed jury. Neal *v.* Delaware, supra; Gibson *v.* Mississippi, supra; Martin *v.* Texas, supra. There is no legal significance, therefore, to be attached to the fact that there were no negroes on the jury that convicted Watkins. Norris *v.* Alabama, supra, was a case where, after announcing the proposition that the exclusion of all negroes from a grand jury by which a negro is indicted, or from the petit jury by which he is tried for the offense, resulting from a systematic and arbitrary exclusion of negroes from the jury lists solely because of their race or color, is a denial of the equal protection of the laws guaranteed to him by the 14th amendment, the court reviewed the evidence and found that it established a systematic exclusion of negroes from jury service in two Alabama counties, solely because of their race and color. The report of that case shows that there the court had before it the Alabama statute, which required the jury commissioners to place on the jury roll and in the jury box the names of all the male citizens of the county who are generally reputed to be honest and intelligent men. The Georgia law is

different. The constitution of this State declares that the General Assembly shall provide by law for the selection of the most experienced, intelligent, and upright men to serve as grand jurors, and intelligent and upright men to serve as traverse jurors. In pursuance of the constitutional mandate, the General Assembly has enacted that: "The board of jury commissioners shall revise the jury lists. The jury commissioners shall select from the books of the tax receiver upright and intelligent men to serve as jurors, and shall write the names of the persons so selected on tickets," as required by law. "They shall select from these a sufficient number, not exceeding two-fifths of the whole number, of the most experienced, intelligent, and upright men to serve as grand jurors, whose names they shall write upon other tickets." Code, § 59-106. After referring to the above, this court, in *Davis* v. *Arthur,* 139 *Ga.* 74, 79 (76 S. E. 676), said: "It is contended that the constitutional requirement is that all persons qualified for jury service shall be placed on the jury list. We do not think so. The constitutional demand is for a jury list composed of upright and intelligent men; not that every upright and intelligent man be included in the list. Otherwise there could be no exemptions, and every upright and intelligent man must needs be placed on the jury list to make it legal. Under the constitution and law it is the sound legal judgment of the commissioners which controls in the number of grand and traverse jurors to be selected. *Thomas* v. *State,* 67 *Ga.* 460; *Wilson* v. *State,* 69 *Ga.* 224; *Rawlins* v. *State,* 124 *Ga.* 38 (52 S. E. 1)." In the Alabama case, the court said that the testimony tended to show that in a long number of years no negro had been called for jury service in that county, and indeed, that no negroes were put on the jury rolls. The stipulation in the instant case shows that the names of negroes are in the jury box, and that from time to time they have been summoned for jury service. That a larger proportion of negroes were not selected for jury service, can mean no reflection on them, nor can it be attributed to a desire to violate the law, since the statute prescribing their duties leaves it to the judgment of the members of jury commissioners as to how many names to place in the jury box. That the lists of names furnished them from the tax digest listed blacks and whites separately means nothing, because the statute requires that the tax-returns of the colored and white taxpayers shall be

made out separately on the digest. Code, § 92-6307. The purpose of this, we apprehend, is to aid in identifying the taxpayer so that the tax officials may the better locate any tax defaulters. The distinction between the Alabama and the Georgia statutes as to the duties of the jury commissioners is most important. In the former, it would seem to be the duty of the officials to place the names of all citizens who came up to the required standards, while, in the latter, they need not, and as a matter of fact do not, place the names of all the upright and intelligent taxpayers in the jury box, but only such a number of them as in their judgment is sufficient.

Able counsel for the accused suggest that the records show that in Bibb County, where the trial took place, there has been but a token acquiescence in the decisions of the Supreme Court of the United States above referred to. They call attention to the fact that in 1940 the total population of Bibb County was 83,783, of whom 35,536, or 42 per cent. were negroes, and that yet, in the jury box from which the trial jury in the instant case was drawn, there were 2,493 names, of whom only 44, or 1.8 per cent., were negroes; and to the further fact that in Bibb County there are a substantial number of good negro citizens whose names are not in the jury box. It does not appear how many of these latter fall within one of the seventeen occupations that are by statute made exempt from jury duty, or whether they are over 60 years of age, and for that reason are exempt. Code, § 59-112. Nor does the stipulation show what number or what percentage of upright and intelligent white men there are whose names are not in the jury box. We do know that the jury commissioners are not required to place in the jury box the names of every upright and intelligent citizen. It is a matter of common knowledge that there is more illiteracy among the blacks in our midst than among the whites. By far the larger portion of the former are ignorant, unskilled, manual laborers, many of whom are utterly incompetent to serve on juries. When the jury commissioners, charged with the duty of placing in the jury box a sufficient number of upright and intelligent citizens, have completed their labors, if it should appear that by a mathematical calculation it contains the names of a much smaller percentage of blacks than of whites, is this fact alone sufficient to convict the commissioners of a deliberate purpose to evade

the law in the face of the sworn testimony of each that no discrimination was had because of race or color? We think not. While the white taxpayers of this State have from their much publicized poverty spent millions of dollars to educate the blacks among us, and while members of that race have shown much advancement since their ancestors were brought from Africa, it would be contrary to what every one knows who is acquainted with the facts to declare judicially that among the blacks of this State there is as large a percentage of those who possess the qualifications for jury service laid down by our Code, as among the white population; and it should be a matter of no surprise that the return of the jury commissioners of Bibb County indicated as much. There is nothing in this record to justify us in concluding that the case should be reversed on the ground that it is shown that there has been a deliberate and systematic purpose of the jury commissioners to evade in this respect the law as announced in the decisions of the Supreme Court of the United States above referred to.

Reliance is placed also on the fact that no negro has ever served as a juror in a criminal case in Bibb County since 1919, the date when the present prosecuting attorney, i. e., the solicitor-general, of the judicial circuit of which the county of Bibb forms a part, took office. Let it be noted that the stipulation is, not that no negro juror has ever been drawn for service in criminal cases, but that none has ever served during the incumbency of the present solicitor-general. That officer frankly stated why that was the case, and placed it in the record. Under our Code, in the selection of a jury, the State, as well as the defendant, is allowed a certain number of peremptory challenges. Code, § 59-805. Such has been our law since long before the 14th amendment was ever dreamed of. Exercising that right, the solicitor-general struck the names of negroes from the list furnished him because, as he said, he did not believe it best to have a mixed jury. Under our practice, no reason is at the time assigned for that right. The very word "peremptory" implies just that. A peremptory challenge is an arbitrary and capricious species of challenge to a certain number of jurors without showing any cause. Lewis v. United States, 146 U. S. 370 (13 Sup. Ct. 136, 36 L. ed. 1011). In Norris v. Alabama, 294 U. S. 587 (supra), may be found the statement that, "Although the State statute defining the qualification of jurors may

be fair on its face, the constitutional provision affords protection against actions of the State through its administrative officers in effecting the prohibited discrimination." We do not understand that the learned Chief Justice thereby meant to lay down the proposition that an attorney in a cause, in exercising his right to peremptory challenges, had no right to strike from the panel of jurors handed to him a juror for any reason on earth or for no reason at all. It may be exercised in a given instance because he was a banker, a farmer, a merchant, a mechanic, a bald-headed man, a black man, a brown man, or a yellow man. Since it is not the right of negro to be tried by a mixed jury (Martin v. Texas, supra, and several earlier cases from the Supreme Court of the United States), the exercise by the State's counsel of his privilege of peremptory challenge, in order to prevent a "mixed jury," shows no ground for reversal.

Jury service is not a right, nor a privilege; but a burden which the State summons certain of its citizens to bear. In the administration of justice with us, issues of fact are submitted to a jury. Mr. Justice Black, in Smith v. Texas, supra, remarked that, "It is a part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community." No such tradition has been established in Georgia. In every community in this State, as in every other State, there are idiots, insane persons, men enfeebled by age, vagabonds, and also men of bad character, white and black. We in this State exclude all such from jury service. We also exclude females and minors. Our juries, therefore, are not bodies "truly representative of the community." We go further. We impose the burden only on those who are upright and intelligent, and not upon all of these. We leave it to the discretion and judgment of the jury commissioners to place on the jury list such of these as in their opinion constitute a sufficient number to carry on the work required of juries. Under our system, the jury is not, therefore, necessarily a cross section of the entire community, but a chosen body selected from a larger number to assist in the administration of justice. It is new to us that "the jury be a body truly representative of the community." We have an entirely different conception of the jury system. No error is shown in the ruling of the trial judge in not sustaining the challenge.

Before taking leave of this branch of the case, it is deemed not inopportune to make this observation. Any attempt by this court or any other State court to disregard the plain and oft-repeated adjudications of the Supreme Court of the United States upon the subject (unless and until that tribunal at some future day shall itself repudiate and overrule them) would be as powerless as the voice of King Canute when he commanded the waves of the sea not to come near his throne; as futile as the efforts of Dame Parkington, the immortal character created by Sydney Smith, who with her mop and broom undertook to arrest the tide waters of the Atlantic Ocean that were entering her domain. When the power to effectually resist is lacking, it is no use to kick against the pricks.

■ The evidence fully authorized the verdict.

*Judgment affirmed. All the Justices concur, except Wyatt, J., absent because of illness.*

ATKINSON, Justice, concurring specially. I concur in the judgment, but not in all that is said in the 3d headnote and the corresponding division of the opinion. That portion of the confession of the principal in the first degree which tended to show the guilt of the accused was not admissible and was highly prejudicial. It is not the policy of our law to permit the confession of a third person, made after the criminal enterprise has ended, to be used for any purpose except to establish the guilt of the party who made it. *Lyon* v. *State,* 22 *Ga.* 399; *Kelly* v. *State,* 82 *Ga.* 441 (2) (9 S. E. 171); *Robison* v. *State,* 114 *Ga.* 445 (2) (40 S. E. 253); *Gibbs* v. *State,* 144 *Ga.* 166 (86 S. E. 543); *West* v. *State,* 155 *Ga.* 482 (117 S. E. 380); *Whitaker* v. *State,* 159 *Ga.* 787 (127 S. E. 106); *Bryant* v. *State,* 197 *Ga.* 641 (9) (30 S. E. 2d, 259).

In order to convict the accused as a principal in the second degree, even though he is jointly indicted as a principal in the first degree, it was essential to establish the guilt of some one as a principal in the first degree, and to do so, the State could establish this by the record of his conviction, by evidence to establish his guilt, or by so much of his confession as admitted his own guilt; but that portion of the confession which implicated the accused was not admissible. This question was not ruled upon in *Studstill* v. *State,* 7 *Ga.* 2 (5), which is cited in the foregoing opinion of the court.

In *Howard* v. *State*, 109 *Ga.* 137 (4) (34 S. E. 330), where the confession of the principal which implicated the accused was admitted, the court, by a full-bench decision, reversed the case, holding that part of the confession tending to show the guilt of the principal was admissible, but such portions as implicated the accused were not admissible. This rule was applied in affirming the case of *Brooks* v. *State*, 103 *Ga.* 50 (29 S. E. 485), where it was stated: "An examination of the record discloses the fact that the trial judge was very careful to exclude from [the confession of the principal in the first degree] all reference to the participation of plaintiff in error with the homicide."

Notwithstanding the foregoing, I am compelled to concur in the result of the ruling made in this division of the opinion, for the reason that there was no proper objection interposed to the admission of this portion of the confession. The only objection made was to the entire confession, and no objection was interposed to that portion which related to the accused. So much of it as would establish the guilt of the principal in the first degree was admissible. It is a well-established rule that, "where evidence is objected to in its entirety, and any portion of the same is not subject to the objection, it is not error to admit the entire evidence over such objection." *Lewis* v. *State*, 196 *Ga.* 755, 759 (27 S. E. 2d, 659), and cit.