1. The verdict was amply authorized by the evidence.
2. Grounds 4, 5 and 6 of the motion for a new trial complain of the refusal of the trial judge to exclude testimony. In each of these grounds this statement occurs: "The court erred in permitting the witness for the State, over objection of defendant's counsel, to testify as follows." It does not appear in the motion or elsewhere in the record what objections were offered to the testimony contained in these grounds of the motion. This being true, nothing is presented to this court for decision. Clifton v. State, 187 Ga. 502
(3) (2 S.E. 2a, 102); Norman v. McMillan, 151 Ga. 363
(4) (107 S.E. 325); Hardy v. Hardy, 149 Ga. 371 (3) (100 S.E. 101); Edenfield v. Brinson, 149 Ga. 377 (4) (100 S.E. 373); Central of Georgia Ry. Co. v. James, 143 Ga. 753 (2) (85 S.E. 920).
3. Grounds 7 and 8 of the motion complain because the trial judge did not declare a mistrial, without a motion therefor by counsel for the plaintiff in error, because the "father of the deceased, James Riley, who was sitting with the solicitor-general, suddenly stood up in the courtroom, looking toward defendant's counsel in a menacing manner, with one hand in his pocket as if to draw a weapon." After this occurrence, the judge ordered the sheriff to evict the father from the courtroom, and instructed the jury to disregard the occurrence. Under these circumstances, no error appears from what occurred. See Hendrix v. State, 173 Ga. 419, 420
(160 S.E. 614), and cit.
4. Ground 9 of the motion complains of the following excerpt from the charge of the court: "One cannot create an emergency which renders *Page 12 
it necessary for another to defend himself and then take advantage of such effort of such other person to do so;" the contention being that there was no evidence to authorize the charge on this subject, and that the charge had the effect of intimating to the jury that the defendant had created an emergency, which he took advantage of in shooting the deceased. The statement of facts following this syllabus opinion shows very clearly that there is no merit in this contention. See, in this connection, Daniel v. State, 187 Ga. 411 (1 S.E.2d 6).
Judgment affirmed. All the Justicesconcur.
 No. 15062. FEBRUARY 17, 1945.
Bennie Hayden was indicted, tried, and convicted, without a recommendation, of the murder of James Riley, and was sentenced to be electrocuted. He filed his motion for a new trial on the general grounds, and by amendment added six special grounds numbered four to nine. His motion was overruled, and he excepted to that judgment.
The evidence adduced for the State was, in substance, as follows:
Mary Nell Riley testified that she was the wife of James Riley, the deceased; that on July 19, 1944, at about eight o'clock that night, the defendant came to the home of her mother-in-law, Mrs. N. L. Riley; that, when the defendant arrived, he got out of a car and came in the yard and called her husband outside and talked to him, but she did not hear the conversation; that, when her husband finished talking to the defendant, he came back on the porch, and she then went out on the porch, where her husband and Mrs. N. L. Riley were already standing; that the defendant came to the door and said he had the children in the car, and Mrs. N. L. Riley said, "Go and get them, Bennie, and let them come here; I want to see them;" that the little girl was asleep, and the defendant said to her, "You are at Mamma Riley's don't you want to see her?" and she said, "Yes;" that the car was parked by the side of the road, about twenty feet from the screened porch; that the defendant took the little girl out of the car and put her on the ground; that there were some steps leading from where the car was parked to the porch, and the defendant "set the little girl down on the ground by the stairs;" that she did not see the defendant get his gun; that he "shot us when he put the *Page 13 
little girl down;" that the shot went through the screened porch, and went in the witness's stomach, leg, and hip; that she did not know whether the shot hit Mrs. N. L. Riley, but James Riley, the witness's deceased husband, holloed "oh," so she figured it hit him; that when the shot was fired, her husband had hold of her hand and was not trying to do anything to the defendant; that her husband dragged her inside the house, and they went between two beds and then to the kitchen, where her husband told them to lie down; that there were no electric lights in the house, but there was a lamp on the eating table; that, after they had gone into the kitchen, the defendant began shooting through a window, and she saw him try to get in a screened window; that she didn't know how many shots the defendant made; that Mrs. N. L. Riley went to another room and got shells for James Riley, the deceased, and James Riley got a gun; that she saw him shoot; that he was standing by a heater in the front room at the time; that she didn't see him at the time he shot, as she turned her head; that she didn't see him when he was shot the last time, but heard him hollo, and the witness slid on her hip to where her husband was near a bed; that, when the defendant went back to the car, Mrs. N. L. Riley called him and told him not to shoot any more; that "she went to the door and called him and said for him not to shoot any more, that he had killed us, and she went out the back door and went up the road;" that she heard her husband shoot only one time, and does not know how many shots were fired before her husband shot one time.
On cross-examination, this witness testified that she and her husband went to the home of Mrs. N. L. Riley on Monday, and that the defendant's wife came to the Riley home Tuesday morning, the day before her husband shot James Riley; that she and James Riley stayed most of the time with Mrs. N. L. Riley and some of the time at the defendant's house, and she called Mrs. N. L. Riley's home her home; that, when the defendant called her husband outside the house and talked to him, the defendant did not have a gun or anything at that time; that the defendant's wife was inside the house at the time; that it is not true that her husband shot at the defendant from the porch; that she never heard but one shot which was fired by her husband.
L. W. Howard testified that he had occasion to investigate the *Page 14 
killing of James Riley, arriving at the Riley home at about nine p. m. with Mr. Sorrells and Mr. Gordon; that Mrs. James N. Riley and her husband and the defendant's wife were there when the witness arrived; that the defendant's wife was in a closet in the room, and James Riley was lying dead on the floor by the bed, and Mrs. James Riley was lying beside her husband; that he and the men who accompanied him made an inspection of the premises. The witness then went before the jury with a small pasteboard box, which he stated represented the home of Mrs. N. L. Riley, where the shooting occurred. He indicated to the jury the portion of the replica representing the front porch and the screen on the porch, the bedroom, the table in the dining room, the kitchen, the closet where the defendant's wife was found, and the bed in the room where the deceased was shot; and he later identified a screen through which shot had penetrated as being the screen taken from a window of the house. He testified that blood was found on the front porch, and there were marks of blood from the front porch to the kitchen, and from the kitchen to where James Riley was killed. He further testified that there was a hole about sixteen inches in diameter, and about waist high, shot in the screen on the front porch; that he has had a good deal of experience with firearms, and "as to whether I know pretty well about patterns of shot from a shotgun, well, different guns shoot differently. I know that pretty well. After examining the pattern of the shot in the screen, as to how far I would say whoever shot it would have to be away from the screen, I would say, according to how the gun scatters, some shots shoot close and some scatter more, I would say six or eight yards. That road, I imagine, is ten yards from the front porch." The witness then testified in detail as to the physical evidence of gunshots, and stated: "As to how many shots I would say were fired there, from my examination of the premises and all I would say one on the front porch, and there was one shot on the table in the window, one shot in the head of the bed, one in the foot of the bed, and one shot in James Riley, and then there was a shot out the window, and a shot there inside of the wall between the window and the fireplace. I say from the physical evidence there were . . two shots from the inside and five from the outside, that is my judgment."
E. S. Gordon testified that in his official capacity as sheriff he *Page 15 
made an investigation of the James Riley killing, along with Mr. Howard and Mr. Sorrells. This witness's testimony was, in substance, similar to that of the witness Howard, and is not set forth in full. He testified: "We found where on this screened veranda were some shot holes like that big shot there (indicating). . . That was right smart of a pattern. I measured it, but I don't remember now what it was; it seems to me like it was sixteen inches. I am not sure. I have had many years' experience with firearms. From that experience — based on that experience, I would be willing to say how far away a man in my opinion would have to be; I would have to say twelve or fifteen steps from there." He also testified that there were five shots from outside the house, which included the shot into the screened porch and the shot which later killed James Riley, and two shots from inside the house; that the defendant was shot that night in the hand and across the stomach, and the witness was of the opinion that only one shot hit him.
Mrs. N. L. Riley testified as follows: "I remember the night that James Riley was killed. The first time that night I saw Bennie, he came to the door and wanted to get in the house; he came there in the car, and I went and called to James to come out there. . . I went out there before James went out there, but I didn't stay long. I did not hear any of the conversation out there. When James came back on the porch, he came back in the house, and Bennie came back, and I stayed there and talked to Bennie on the porch. The porch door was latched. James was right behind me. . . As to what we talked about, he wanted to get in the house, and I asked him if he had a gun or knife or anything, and he said he didn't have anything. . . He said he wanted to talk to Givens and wanted her to come out to the car. Givens was in the house, but he didn't know she was in there. . . As to what else was said between me and Bennie, he said he had both babies out there . . and I said, `Bring them and let me see them.' . . He went out to the car, and he said to her, `Wake up, you are at Mamma Riley's,' and he reached and got his gun; he got out the baby and the gun and shot James and Mary Nell. He set the baby out in the yard. I saw him set her down. When he got the gun, he did not advance towards the house; I was standing waiting for the baby and didn't see the gun. I did not see the *Page 16 
gun before he shot; I didn't because I wasn't expecting it. I got some of those shot in my hip. It must also have hit James because he holloed, `Oh!' Mary Nell fell, and James dragged her in the house, and all three of us went in the house together and shut the door, and then he came around to the window and went to shooting. I went in the kitchen. I did not see him come in the window; we had the shades down and I had the light burning . . in the kitchen on the table. . . I guess I was standing in the door between the main room and the kitchen. Mary Nell was on the floor and James was on the floor too; he told us to lie down on the floor but I didn't. I didn't know whether it was the first shot that fired then that hit me or not, but there were several made. . . I am talking about in the kitchen. . . All of the others had gotten into the other room and he shot into the kitchen. More than one shot was fired. When he shot me, I got a towel to keep the blood from running, and then I went to the other room, and James reached for the gun and asked me for the shells, and I gave them to him. I got the shells off the bed. The gun was side of the bed. There was not a shot made as I know of while I was going from the kitchen to the other room. I didn't see him come through the window; I had a towel up to my face, but the rest saw him. James shot, and Bennie said, `I got him,' and Bennie turned and shot James, and James said, `He killed me.' After I got the shells and gave them to James, James shot him. He was close to the heater when I gave him the shells, and I was standing by him when he was shot. The last shot that was made that hit him I think he was standing up; we blowed out the light and we was in the dark. . . If James made more than one shot, I didn't hear it; but they said there was two. I just know of one from the inside. I don't remember how many shots were made before James shot the first time; there were more than one; there were several made that didn't hit anybody. As to whether I saw James after he was shot the last time, I saw him when he lay down; I was standing side of him. I saw him when he fell. . . After he shot James, I thought I would shoot out there if I saw him, and I said he turned the fire on James so quick I had better not; so I laid the gun across the bed and I opened the door and called Bennie at the car and I said, `Bennie, you had better not shoot any more,' and I started off to Mr. Armstead's, and I left from *Page 17 
there. . . James did not shoot a gun out there at all on the porch or before we went in the house. I do not know of but one time that James shot, the next to the last shot."
Dr. H. A. Miller testified that he is a practicing physician; that he had occasion to treat the wounds of Mrs. N. L. Riley, Mrs. James Riley, and Bennie Hayden at a hospital around nine o'clock on the night that James Riley was killed; that he smelled liquor on the defendant, but didn't know whether the drinking took place before or after the shooting. The witness testified as to the nature of the injuries to Mrs. N. L. Riley and Mrs. James Riley, and testified with reference to the injuries to the defendant: "His injury was to his hand and to his left thigh and the right wrist. He was shot with a shotgun, bird shot. From my examination of his injuries, I would say that he was shot only once."
The defendant made a lengthy statement to the jury, in which he recounted the hardships of his life and many abuses and ill treatment by his wife and her father, and stated that his wife was the cause of his present trouble. He stated: "One night I was coming home from work, and this boy, Curtis Bowen, was over there to the other side of my house. I didn't think anything of him being at my house or nothing, and I saw car tracks from my yard, so I asked my wife if Curtis had been over there, and she said, `Hell, no,' just like that. . . That was on the fifth of July. . . I said, `Givens, you have told me a story,' just like that, and she lit on me, cursing me out, and me and her had a little argument, and she called me `vile names' and I slapped her, and I said I had seen his track and she said it wasn't his track in my yard. Then, on the 17th of July . . my automobile chocked down, and this boy, Curtis Bowen, stopped at Ed Blackburn's, neighbors that live close to me, and I seen Curtis, and he says, `I am in an awful hurry to get home,' and I said, `I have got to go off a little piece, what about pushing me off?' and I went to a cross road and parked my automobile . . and I walked to my house, and there was Curtis Bowen sitting huddled up with my wife, and I said, `Get your damned self off my porch,' and I knowed him, and he was sitting there hugging my wife, and he jumped off the porch, and I got my knife out and tried to cut him, and he knocked me in the head, and he told the old lady to *Page 18 
run, and she took off . . and I went home to get my gun out, and naturally if I could have caught them together I expect I would have shot them. The next day I was very mad, and I drove over to my mother-in-law's on Tuesday, that is on July 18, and I asked Mrs. Riley had Givens come down there to her, and she said, `No,' and she said, `What is the matter?' and I said, `I saw her hugged up with Curtis Bowen, and she ran off and left me with my little baby two years old.' Well, I told Mrs. Riley about it, and she said, `She just as well —' Well, I didn't aim to have no argument, in fact I went down there in the yard that day and wasn't mad with them or nothing, and I told Mrs. Riley what she had done, and she said, `She just as well have her dates as you,' and I said, `I have no dates.' . . And so I come back. . . My little girl says, `Where is Mamma, where is my Mamma?' just like that, and I said, `Mamma has gone and left us,' and she said, `Where?' just like that; and on Wednesday evening, July 19, I started out to go down there and see if she was down there. . . I goes down there on Wednesday night to Mrs. Riley's around eight or eight-thirty. . . Mrs. Riley and Mrs. James Riley and James Riley all comes out on the porch, and he comes out there to the car, and he says, `Get out,' and I got out and stood up there and talked to him, and I asked him if my wife was down there, and he said, `Yes,' and I said, `James, you go in there and see her and tell her I want to talk to her about the children. . . My little girl wants . . to see her Mamma;' and he said he would, and me and James walked to the screen porch, and Mrs. Riley said, `What do you want ?' and I said, `I just want to talk to my wife; I can not work for my little children and attend to them too, and something has got to be done.' My little baby was bad off sick, and his mouth was almost rotten. . . Mrs. Riley said, `She is her own boss; don't come here looking for her.' I told her I didn't want no argument. I said, `I am going to have to put my children in the nursery and do the best I can with them,' and Mrs. Riley said, `You are not going to do any such thing,' and what all I had to do or not to do, and I wasn't allowed a say-so over my own children, and I didn't know whether my wife had quit me or not; all I knew is what I said, and I didn't know what to do; and Mrs. Riley says, `Where is your babies, are they out there now?' and I said, `Gale is in the car with me and my mother has had *Page 19 
Gary,' that is my two-months-old baby boy; and she says, `You ought to be at home with him.' I didn't say Givens ought to be there too, but I thought it . . and Mrs. Riley said, `Go and get Gale and let me see her,' and I comes out to the automobile there in the front . . and I said, `Wake up, you are down at Granny Riley's, don't you want to see her?' and I woke her up, and I walked up three rock steps, and when I got up those steps, Mrs. Riley said, `Shoot him, James,' and then the load went in my hands . . and went in my thumb; and you can see where the shot came over there . . and I would like to show them those others, right in the stomach right here . . you see those shots there that went in my leg, and there is shots right down there in the stomach. . . When they shot me, I was on the rock wall right there; that was the load that hit me; and I grabbed my gun out of the automobile, and that screen door slammed, and James ran back in the house after that started. When I shot, I dropped my little girl there and grabbed my shotgun and shot some of them before they got in the house; and, when I shot, the little girl ran to the screen porch, and I ran up there to get her, and I don't know, it was scary times around there, and I shot in the house. I don't know whether I stuck the gun in there or was standing off or not. I was so scared I snatched out the screen, and I said, `Mrs. Riley, don't you shoot me any more; I didn't come here to have any trouble, I came here to talk to my wife and to get some kind of an agreement about the children;' and I ran back out to the porch, and I didn't have time to get my little girl. . . I don't know whether I knocked the window out, I was so scared I don't know exactly what I done, and Mrs. Riley was saying, `Blow him in two, James,' just like that; so I was standing out there, and just as I started, when they was facing me, just like that, I started to stoop just like that to get my little girl, and I told them not to shoot any more as I didn't want to have any trouble, and that shot came out of the window and hit me right here (indicating), and I seen the blaze from the fire, and I shot where the blaze of the fire was, and I reckon that is the load that hit the boy or when he fell; and when he fell the last words he said was, `I told you all you ought not to shoot like this,' those were his last words; and Mrs. Riley and them began to holloing, and I said, `I ain't going to shoot up there any more; you brought *Page 20 
it on yourselves; I didn't want to have any trouble when I came down here,' and . . I hobbled to my automobile," He then related details as to his getting into the automobile, his driving to Walnut Grove, and his being taken to a hospital, and started that he learned of the death of James Riley after he entered the hospital.
Curtis Bowen, a witness for the State, testified that he had never had any intimate relations with the defendant's wife; that he knew the defendant's wife well enough to call her by her given name; that on the night that the defendant claimed to have caught his wife and the witness together, the witness had pushed the defendant's car into the yard, had started home in his own automobile, and discovered that he was about to have a flat tire; that he returned to the defendant's home for the purpose of borrowing a tire pump, and after he got into the yard, and while the defendant's wife was on the porch, the defendant came out and said, "Damn you, you came to see my wife;" and the defendant cut him, and the witness hit the defendant and caught his arm; that there was never anything improper between the defendant's wife and the witness, but that the defendant did accuse him of being intimate with his wife.