23397. WHITUS v. THE STATE.

ARGUED MARCH 15, 1966—DECIDED APRIL 12, 1966—
REHEARING DENIED MAY 5, 1966.

*P. Walter Jones, William N. Sinrich, Morris Brown,* for appellant.

*Fred B. Hand, Jr., Solicitor General, Arthur K. Bolton, Attorney General, Rubye G. Jackson, Assistant Attorney General,* for appellee.

QUILLIAN, Justice. ■ (a) The first complaint of the enumeration of errors is: "The court erred in failing to direct a verdict of acquittal for the defendant because of failure of the State to prove, beyond a reasonable doubt, the guilt of the defendant in the crime alleged to have been committed."

It is never error in a criminal case for the judge to refuse to direct a verdict of not guilty. *Anglin v. State,* 222 Ga. 9 (1) (148 SE2d 390); *Winford v. State,* 213 Ga. 396 (5) (99 SE2d

120); *Albert v. State,* 215 Ga. 564 (3) (111 SE2d 215). The Act of March 15, 1966, Ga. L. 1966, p. 493, amending the Appellate Practice Act of 1965, contains nothing contrary to the rule pronounced.

(b) We have carefully considered the averment of the first enumeration of error that the State failed to prove, "beyond a reasonable doubt, the guilt of the defendant in the crime alleged to have been committed," to determine whether it could be construed as tantamount to an allegation that the verdict was without evidence to support it. The conclusion is inescapable that the quoted language does not amount to an assertion that the evidence was not sufficient to support the verdict. This is true because a verdict supported by any competent evidence will not be disturbed by this court unless errors of law appear. *Alfred v. State,* 6 Ga. 483 (2); *Reed v. State,* 195 Ga. 842 (7) (25 SE2d 692).

Where evidence is adduced to authorize a conviction in a criminal case, it is the province of the jury to decide the weight and credit to be given the evidence and whether the State's proof when considered together with that submitted on behalf of the defendant meets the standard of removing every reasonable doubt as to the guilt of the accused. *Code* §§ 38-105, 38-110. This is apparent from the definition of reasonable doubt as doubt that "leaves the mind of the jury wavering and uncertain." *Chancey v. State,* 145 Ga. 12 (1) (88 SE 205); *Lampkin v. State,* 145 Ga. 40 (3) (88 SE 563).

(c) However, had the question of the sufficiency of the evidence to support the verdict been brought to this court for review the result would have been the same. The defendant Whitus made a detailed statement in open court concerning the circumstances under which the deceased was slain. He frankly admitted he was present and participated in the unlawful homicide. His only defense was that he did not willingly take part in the crime, but that his participation was compelled by intimidation and coercion imposed upon him by a co-defendant Leon Davis. Davis testified, as a witness in the case, that the defendant Whitus's involvement in the criminal transaction was not only voluntary but that Whitus actually instigated the plot to slay the deceased.

Consequently, while Whitus's statement, which was corroborated by another co-defendant, John Daniels, was evidence of his innocence under the provision of *Code* § 26-402 which reads: "A person committing a crime or misdemeanor under threats or menaces, which sufficiently show that his life or member was in danger, or that he had reasonable cause to believe, and did actually believe, that his life or member was in danger, shall not be found guilty," Davis's testimony was in conflict with Whitus's statement and testimony which resulted in a sharp conflict in the evidence and created an issue of fact for solution by the jury.

It is true Davis testified in response to questions propounded by the solicitor general: "Q. After you hit Mr. Peter Glenn in the head with this rifle, he was put in his car? A. That's correct. Q. He was? A. Yes sir. Q. Where did you say you were going, if anywhere? A. Albany. Q. Who did you tell you were going to Albany? A. Phil Whitus. Q. Was anybody else present? A. Stillman and Daniels. Q. Did you get in your car right after that and head down the road? A. I went back to the house and told my wife to take the children and go up to the next house. Q. All right, did anything happen after you started going down the road? A. Yes sir. Q. What happened? A. I had a flat tire. Q. Do you remember about where you had the flat tire? A. No sir, I don't exactly remember about where I had the flat, but I remember about where Phil mentioned it to me at. Q. Were you still on the dirt road when you had the flat tire? A. Still on the dirt road. Q. During the time the tire was being changed, did you and Phil Whitus have a conversation? A. Yes sir, we had a few words. Q. What did Phil say, if anything, to you? A. He asked me was I going to leave that man at my house. Q. What did you tell him? A. I asked him why and he said if they find him at the house they'd probably kill all four of us. Q. Then what did you or Phil either one say? A. Said we'll go back. Q. Who said that? A. Phil said, 'We'll go back.' And on the way back he said, 'If he ain't dead we'll shut his mouth up for good, so he can't talk.' Q. Did he say where he would shut his mouth up for good? A. He mentioned Buzzard Roost. Q. What did you say in response to that, if anything? A. I told him that was too close to the house. Q. Then what

was said, if anything? A. I told him to take my car and push Mr. Glenn's car and I'd signal when to stop. Q. Did you or did you not at anytime threaten Phil Whitus or anyone else? A. No sir, I didn't."

On cross examination he admitted in response to a question that on the first trial his attorney plead "you were insane at the time you did the shooting? A. He didn't plead it, I was. Q. You were insane at the time all this took place? A. Not completely insane, but when I was drinking I just couldn't think clear. Q. When you are drinking then you are just like you are insane. Is that right? A. You could put it that way. Q. And this night you were drinking? A. That's correct. Q. You again plead that while you were drinking you were so insane that you didn't know what you were doing? A. I haven't said anything. I haven't said anything. Q. Did you make a statement yesterday? A. I haven't made any statement period. Q. Did you appear for any statement for yourself? A. Do you mean — Q. In court. A. No sir, I did not. Q. But on the first trial you did make a statement, the trial when Mr. Peacock was your lawyer? A. I did. Q. And you plead that when you drank you became insane. A. That's correct. Q. And you now say that what happened at that time, what you say Phil Whitus does, happened when you were insane because you were drinking? A. That's correct. . . Q. But you still say that when you drink you were insane? A. That's correct, yes sir. Q. So what you testified about what Phil Whitus did was at a time that you yourself admit you were insane. A. I was drinking."

His evidence on redirect examination was: "Q. Mr. Jones asked you a few minutes ago whether you were insane. The facts that you have just related to this jury, are they true insofar as they deal with Phil Whitus? A. Correct. Q. They are true? A. Yes sir. Q. Do you know what you are talking about now? A. I ain't—I believe I do." So, while there was an issue of fact as to his credibility, that too was for the jury to decide.

We also observe that as set forth in the foregoing statement of facts there was proof of circumstances which the majority of this court on a former review of the same case considered sufficient, without the aid of Davis's testimony, to create an issue of

fact concerning the voluntary nature of Whitus's complicity in the murder of the deceased, and evidence of additional similar circumstances adduced upon the trial we now review.

■ The second enumeration of error is: "The court erred in failing to make its own inquiry into the competency of the testimony of Leon Davis after his admission under cross examination that he was both drunk and insane at the time the crime was committed." The complaint is evidently predicated on the provisions of *Code* § 38-1610: "The court shall, by examination, decide upon the capacity of one alleged to be incompetent from idiocy, lunacy, or insanity, or drunkenness, in fancy."

There was no question of the witness Davis's competency at the time of trial. "The state of the mind of the witness at the time of the occurrence testified about would go to his credit, which is always a question for the jury. The state of his mind at the time of testifying on the trial would go to his competency as a witness, and . . . as a general rule the competency of a witness is a question for the court and not for the jury. . ." *Scott v. State*, 57 Ga. App. 489, 494 (195 SE 923). The text of 58 Am. Jur. 92, Witnesses, § 118, reads: "While it is true that great doubt must necessarily attach to the evidence of persons who, having recovered from a state of insanity, seek to testify to facts occurring during its existence, it is proper to admit the testimony, and it is for the jury to judge of the credit that is to be given to it. A man may have many delusions, and yet be capable of narrating facts truly; and the existence of such delusions on his part at the time of the occurrences which he is called on to relate goes to his credit, and not to his competency. . ." It follows that the alleged admission of the witness Davis touching his drunkenness and insanity on the occasion when the events to which he testified occurred could not be considered as evidence of his incompetency to testify, but such admissions were for consideration of the jury in passing upon the credibility of his testimony; hence, no duty rested upon the trial judge to conduct an inquiry concerning the competency of the witness.

However, had there been evidence that the witness was not competent, since no objection to his competency was made at any

stage of the trial, no duty would in that event have devolved upon the trial judge to conduct inquiry into the matter of his qualification to give evidence. *Brunswick &c. R. Co. v. Clem,* 80 Ga. 534 (3) (7 SE 84); *Dowdy v. Watson & Lewis,* 115 Ga. 42, 44 (41 SE 266).

■ The third enumeration of error is: "The court erred in failing to charge the jury that drunkenness which dethrones reason and memory, shall incapacitate during its continuance." The charge the appellant contends should have been given is couched in the language of *Code* § 38-1608. The enumeration of error does not suggest to what fact or issue of the case the omitted charge is applicable, but the appellant insisted in argument here that the charge should not have been given to guide the jury in passing upon the competency of a State witness, Leon Davis.

The rule is, as discussed in the preceding division of this opinion, that evidence that the witness is in a drunken condition when he undertakes to testify, goes to his competency, while proof that he was drunk on the occasion concerning which he testifies goes only to his credit.

There is authority that, in the absence of a written request, the trial judge does not ordinarily charge the jury concerning the witness's competency (*Norton v. State,* 72 Ga. App. 635 (34 SE2d 669)), and it is never error for the judge to omit to instruct the jury concerning the credibility of a witness. *Cole v. Byrd,* 83 Ga. 207 (3) (9 SE 613); *Turner v. State,* 139 Ga. 593 (1) (77 SE 828); *Strickland v. State,* 207 Ga. 284 (5) (61 SE2d 118). Similar on its facts to the present case is *Watkins v. State,* 19 Ga. App. 234 (4) (91 SE 287). In the latter case it was held: "An exception that the court 'failed to instruct the jury as to the law relating to idiots and lunatics as witnesses, and gave the jury no rule or instructions for guiding them in weighing and considering the evidence of idiots and lunatics,' will not require a reversal, where no such charge was requested, and where the court charged the jury as follows: 'The court can not tell you what any witness swore or what any testimony in the case is. The court can not tell you what weight or what credibility you will give to the testimony that is introduced.

You have the right, in passing upon the evidence in the case, to observe the witness's manner on the stand; the witness's interest or want of interest, bias, or prejudice, if any; the witness's intelligence or want of intelligence; the witness's knowledge or want of knowledge, as well as every circumstance that has occurred during the trial and in your presence, you have a right to consider, in passing not only upon the weight and credibility of the testimony of the witness, but upon the case itself.' "

The third enumeration of error is without merit.

■ The fourth enumeration of error alleges: "The court erred in allowing the witness, Leon Davis, to testify, since the said Leon Davis was the perpetrator, and the statement solicited from him by the solicitor was prior to his conviction, which made said statement a confession and it did not appear from the record that the solicitor advised the witness that he had a right to remain silent and it also appeared affirmatively from the record that the Honorable Clarence Mayfield, attorney for the witness, was not present when the confession was exacted from the witness."

There was no objection made to the witness Davis's competency and none was interposed to his testimony. Where there is no objection to evidence its admission is not reversible error. *Tilley v. McJunkin,* 116 Ga. 426 (1) (42 SE 741); *Hayden v. State,* 199 Ga. 11 (2) (33 SE2d 258); *Queen v. Hunnicutt,* 220 Ga. 89 (3) (137 SE2d 45).

■ Ground 5 of the enumeration of errors specifies that the trial court erred in dismissing the challenge to the array of petit jurors since it affirmatively appeared that 49% of the population of Mitchell County were Negroes and only 7% of the petit jury were of the Negro race.

When the case was argued in this court counsel for the appellant conceded that the fifth enumeration of error alluded only to the panel of petit jurors from which the jury in this case was drawn. In this connection, the evidence adduced at the hearing of the challenge to the array showed that of the total population in Mitchell County 21 years old and over, 5,726 were white and 4,480 were nonwhite, Negroes constituting approximately 44% of the adult population, according to the 1960 census. The only

evidence in the record as to the proportionate number of Negroes on the petit jury was that at least 7 out of 90 jurors on the particular panel put upon the defendant were Negroes, or 7.7% of the panel. There is no other definite evidence regarding the number of Negroes on the jury except a "reasonable guess" made by one witness, a jury commissioner, that of the present jury list, revised in February, 1965, and containing around 600 names, 25 to 30% were Negroes.

Our consideration of this ground is confined to the complaint made in the enumeration of errors and urged before this court. Hence, we have no question concerning the proportionate number of whites and Negroes in the jury box or on the jury list of the county, or other grounds set forth in the challenge to the array, since the sole basis of complaint is that there was a variance between the percentage of Negroes in Mitchell County and the percentage of Negroes on the petit jury panel.

The United States Supreme Court held in Akins v. Texas, 325 U.S. 398, 403 (65 SC 1276, 89 LE 1692): "Purposeful discrimination is not sustained by a showing that on a single grand jury the number of members of one race is less than that race's proportion of the eligible individuals. . . . Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried. . . . The mere fact of inequality in the number selected does not in itself show discrimination." See Brown v. Allen, 344 U.S. 443, 471 (73 SC 397, 97 LE 469). As succinctly stated in Swain v. Alabama, 380 U.S. 202, 208 (85 SC 824, 12 LE2d 759): "A defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. Virginia v. Rives, 100 U.S. 313, 322-323; Gibson v. Mississippi, 162 U.S. 565; Thomas v. Texas, 212 U.S. 278, 282; Cassell v. Texas, 339 U.S. 282." See also Fay v. New York, 332 U.S. 261, 291 (67 SC 1613, 91 LE 2043); Hoyt v. Florida, 368 U.S. 57, 69 (82 SC 159, 7 LE2d 118).

In *Sims v. State*, 221 Ga. 190, 192 (144 SE2d 103), a recent full-bench decision as to the point in question, this court followed Swain v. Alabama, 380 U.S. 202, supra, and under similar facts

held: "All the defendant showed here, as was done in the Swain case, which involved allegations of discrimination in the selection of jurors, is that the percentage of Negroes on the jury list did not reflect the percentage of Negroes in the county. This is not sufficient to show invidious discrimination." See *Watkins v. State*, 199 Ga. 81, 91 (33 SE2d 325); *Heard v. State*, 210 Ga. 523 (2) (81 SE2d 467); *Brookins v. State*, 221 Ga. 181, 187 (144 SE2d 83).

Where, as here, the defendant is attempting to show discrimination based solely on a variation between the percentage of Negroes in the county and the percentage of those on the panel, the ruling in the above cited cases is applicable. The trial judge did not err in overruling the challenge to the array of the petit jury.

■ It is not necessary to pass upon the question of whether the appeal in this case should be dismissed since the judgment is affirmed. *City of Hawkinsville v. Williams*, 185 Ga. 396 (1) (195 SE 162); *Littlegreen v. Gardner*, 208 Ga. 523 (1) (67 SE2d 713); *Hunter v. Ogletree*, 212 Ga. 543, 544 (93 SE2d 717).

*Judgment affirmed. All the Justices concur.*